DeLoney v. State.

Opinion delivered November 30, 1908.

88    311
89    435
90    599

1. GAMING—PERMITTING GAMBLING TABLES TO BE MAINTAINED.—An indictment which alleges that defendant, owning, using and controlling a certain building described, "did unlawfully and knowingly suffer and permit gambling tables to be maintained and gambling with dice and cards to be carried on and exhibited in his said house," etc., charges a violation of Kirby's Digest, § 1735. (Page 312.)

2. CRIMINAL LAW—SUFFICIENCY OF INDICTMENT.—Under Kirby's Digest,. § § 2228-9, an indictment which charges the offense with such a degree of certainty as to enable the court to pronounce judgment on conviction is not rendered insufficient by any defect which does not tend to the prejudice of the substantial rights of the defendant on the merits. (Page 313.)

3. STATE—BOUNDARY LINE.—As the determination of the boundaries of a State is a political, rather than a legal, question, it is the duty of the courts to respect the pronounced will of the legislative department. (Page 316.)

4. STATE—BOUNDARY LINE.—The boundary line between the State of Arkansas and the State of Texas is the south bank of Red River, and not the thread of the stream. (Page 316.)

5. SAME—CHANGES IN RIVER AS AFFECTING BOUNDARY.—Where a river bank constitutes the boundary line between two States, this line may change with the gradual changes of the bank by accretion or reliction,. but not where the bank is changed suddenly by avulsion. (Page 316.)

6. EVIDENCE—PRIVATE SURVEYS.—Evidence of a private survey which was made without authority of either State was inadmissible to prove the boundary line between Arkansas and Texas. (Page 317.)

7. SAME—PROOF OF STATE BOUNDARIES.—Ancient public boundaries may be proved by general reputation, by tradition and by hearsay declarations of persons with knowledge, made before the controversy arose.. (Page 317.)

Appeal from Little River Circuit Court; James S. Steel,. Judge; affirmed.

An indictment was returned against Jack DeLoney in Little River Circuit Court, as follows (omitting caption):

"The Grand Jury of Little River County, in the name and by the authority of the State of Arkansas, accuse the defendant, Jack DeLoney, of the crime of running a gambling house, committed, as follows, viz, the said defendant in county and State aforesaid, on the 1st day of January, 1908, then and there owning, using and controlling a certain building or outhouse situated north of the south bank of Red River adjacent to what is known

as "the cut-off," did unlawfully and knowingly suffer and permit gambling tables to be maintained and gambling with dice and cards to be carried on and exhibited in his said house or outhouse, against the peace and dignity of the State of Arkansas."

There was evidence tending to prove that defendant was guilty of permitting gambling to be conducted in a house owned by him situated north of the south bank of Red River, on an island therein which is now north of the main channel of that river, but which, until about thirty years ago, was south of the main channel.

The court charged the jury as follows:

"The line between Little River County, State of Arkansas and the State of Texas is the south bank of Red River, unaffected by any sudden changes or cut-offs in said river."

Defendant was convicted and fined $200, and has appealed.

*Jobe & Carrigan,* for appellant; *Hart, Mahaffy & Thomas* (of Texas), of counsel.

1. The indictment charges two offenses, and the demurrer should have been sustained. Kirby's Digest, § 2230, 1732-5-9; 83 Ark. 254; 45 *Id.* 62; 13 *Id.* 680.

2. The venue was not proved. Under the treaty with Spain and the act of Congress admitting the State into the Union, the middle of the main channel of Red River was the boundary line, and not the south bank. Kirby's Digest, p. 174; 8 St. at Large, 252-3-4, art. 3; 143 U. S. 621; 64 *Id.* 505 (16 L. Ed. 557).; 5 Wheat. 374; 143 U. S. 361. A sudden avulsion does not change the boundary line. 64 U. S. 515; 143 *Id.* 361.

*William F. Kirby,* Attorney General, and *Daniel Taylor,* Assistant, for appellee.

1. Only one crime is charged in the indictment, the violation of § 1735 of Kirby's Digest. 45 Ark. 62.

2. The boundary line of Arkansas is the south bank of Red River unaffected by any sudden change or cut-off. This is admitted virtually by defendant.

HILL, C. J. Jack DeLoney was indicted by the grand jury of Little River County "of the crime of running a gambling house." The indictment will be found in the statement of facts.

1. The first question raised is the sufficiency of the indict-

ment. It is said that it contains two offenses, being those created in sections 1732 and 1735 of Kirby's Digest. The court does not agree with the contention, and is of the opinion that it is a sufficient indictment under section 1735. It charges the offense therein described with sufficient certainty to enable the court to pronounce judgment on a conviction according to the right of the case; and the only defects therein, if any, do not prejudice any of the substantial rights of the defendant; and, under sections 2228, 2229 of Kirby's Digest, these are the tests of the sufficiency of an indictment. .

II. The next contention—and, in fact, the principal contention of the case—is that the testimony has failed to prove that the place where the crime was committed was in the State of Arkansas. The State proved these facts: That the defendant DeLoney owns a plantation on Red River, and has a saloon and gambling house on what is known as "The Island," which is a body of land cut off by a change in the channel of the river, called the "Rochelle Cut-off;" the present channel being on the south side of the island, and the old channel being the north boundary of the island. This occurred about thirty years ago. There has been little caving of the banks since the island was formed. DeLoney built a house some forty yards north of the saloon, and built it on stilts over the old bed of the river, about twelve or fifteen feet from the old south bank, with a walk running out to it from the saloon. The bank at that place is ten or twelve feet high. The gambling house stands over what was the bed of the river prior to the cut-off. The question is, whether the middle of the channel of Red River, or the south bank thereof, is the boundary line between Arkansas and Texas. If the south bank is the boundary line, the evidence of the State clearly shows that this house is situated north of the south bank of the river.

The Texas Court of Appeals, in the case of *Spears v. State,* 8 Tex. Ct. of App. 467, held that under the Treaty of 1819 between the United States and Spain, which fixed the Rio Roxo of Nachitoches, or Red River, as one of the boundaries between the two nations, the jurisdiction of Texas extended to the middle of Red River. The reasoning is based on the theory that the treaty was silent as to which bank of the stream should constitute

the boundary, and that the general rule is that the designation of a river as a boundary, in the absence of further description, means the middle of the stream. This is the correct general rule, as will be seen from an examination of the cases cited in said opinion. But it was incorrect in this particular instance because the language of the treaty, construed in the light of the negotiations leading to it and the subsequent action of the United States and of the States of Arkansas and Texas, shows that this construction was not intended, even if permissible from the language employed. The history of the negotiations leading up to the treaty between the United States and Spain may be found in *United States* v. *Texas*, 162 U. S. 1, this being one of the cases involving the controversy between the United States and the State of Texas over the jurisdiction of Greer County. It will be seen therefrom that negotiations pended for some time between the two governments, and one of the points of negotiation was as to the boundary line along the Sabine and Red and Arkansas rivers. Finally, Mr. Adams, Secretary of State, submitted a proposition to the Spanish minister covering this, among other points, proposing that the Sabine and Red and Arkansas rivers, and all islands in the same, wherever said rivers were the boundaries between the two governments, should belong to the United States, and the western bank of the Sabine, and the southern banks of the Red and Arkansas, throughout the courses there described, should be the limit of the jurisdiction of Spain. The Spanish minister required that "the boundary between the two countries shall be the middle of the rivers, and that the navigation of the said rivers shall be common to both countries." Mr. Adams replied that the United States had always intended that "the property of the river should belong to them," and he insisted on that point, "as an essential condition, as the means of avoiding all collision, and as a principle adopted henceforth by the United States in its treaties with its neighbors." He agreed, however, "that the navigation of the said rivers to the sea shall be common to both people." The Spanish minister assented to this, and the result was the treaty, the third clause of which contained the following: "The boundary line between the two countries, west of the Mississippi, shall begin on the Gulf of Mexico, at the mouth of the river Sabine, in the sea, continuing

north, along the western bank of that river to the 32d degree
of latitude; thence, by a line due north, to the degree of latitude
where it strikes the Rio Roxo of Natchitoches, or Red River;
then following the course of the Rio Roxo westward to the
degree of longitude 100 west from London and 23 from
Washington; then crossing the said Red River, and running
thence, by a line due north to the river Arkansas. * * * All
the islands in the Sabine, and the said Red and Arkansas rivers,
throughout the course thus described, to belong to the United
States."

The fourth clause provided for commissioners to be ap-
pointed to fix with more precision the lines between the two na-
tions. The treaty may be found in full in 8 Statutes at
Large 252 *et seq.* By the treaty of 1828 between the United
States and the United Mexican States (8 Stat. at L. 372), the
same language was followed fixing the line between Mexico and
the United States as was used in fixing the line between Spain
and the United States, so far as the Red River was concerned.

The Republic of Texas, by an act passed in 1836, de-
clared that the civil and political jurisdiction of that republic
extended to the boundaries therein described, and accepted the
boundary line with the United States in this particular as de-
clared in the said treaty between Spain and the United States.

In 1845 Texas was admitted as a State into the Union by act
of Congress, and was described as territory properly included
in and rightfully belonging to the Republic of Texas, and one
of the conditions of admission being that Texas should be formed
subject to the adjustment by the United States of all disputes
as to boundaries, etc.; and these conditions and all other condi-
tions of the enabling act were accepted by Texas.

The act admitting Arkansas to the Union, passed June 16,
1836, described the boundaries of the State at this point as fol-
lows: "And from thence to be bounded on the west to the
north bank of the Red River by the lines described in the first
article of the treaty between the United States and the Cherokee
Nation of Indians, * * * and to be bounded on the south
side of Red River by the Mexican boundary line to the north-
west corner of the State of Louisiana." Kirby's Digest, p. 174.
The Constitution of 1836 contains the same language describing

the boundaries of the State. All of the subsequent Constitutions contain the same language, except that the boundary of the State of Texas is substituted for the Mexican boundary line.

It is clear, from the act of Congress admitting the State and the Constitutions of the State, that all of Red River at this point was intended to be included within this State; and the court might well stop at that point, for this is a settled principle: "A question like this respecting the boundaries of nations is, as has been truly said, more a political than a legal question; and, in its discussion, the courts of every country must respect the pronounced will of the legislature." *United States* v. *Texas,* 143 U. S. 621. But, as the Texas Court of Appeals had reached the conclusion that the jurisdiction of that State extended to the thread of Red River, it has been thought best to point out wherein that court erred in applying the general rule which it did in reaching that conclusion.

These treaties between the United States and Spain, and between the United States and the Mexican States, and the acquiescence therein by the Republic of Texas and the State of Texas, demonstrate that the boundary line was the south bank of Red River, and not the thread of the stream; and this jurisdictional line was adopted when Arkansas was admitted into the Union, and is embedded in its Constitution.

The question is therefore narrowed to whether this gambling house was erected in the bed of Red River or upon the south bank of it. Appellant asked, and was given, an instruction to the effect that "a sudden cut-off or change in the channel of the river will not alter or change the line, but the south line of the old river will remain the same;" and this is unquestionably the settled doctrine upon that subject. Applying it here, the evidence shows that the cut-off was made by a sudden change of the channel, and not by reliction. A jurisdictional line changes with the gradual changes of the shore by accretion or reliction, but not where the change is suddenly made by an avulsion. *Nebraska* v. *Iowa,* 143 U. S. 359; *Nix* v. *Pfeifer,* 73 Ark. 199. Therefore, the determining test under this evidence was the location of the south bank of Red River prior to the cut-off, and the case was properly tried on that theory, as shown by the instructions.

The court excluded evidence of surveys which was offered, whereby it was sought to prove the true boundary line between the States of Arkansas and Texas at this place; but they were predicated upon a former survey known as the Cullen McKinney Head Right Survey, which was made prior to the admission of the State of Arkansas into the Union. It was not shown to be a survey authorized by either government, but was the survey of private property. This would not be admissible. 2 Enc. Ev. pp. 706 and 707 and notes.

Testimony was also rejected of a witness who was a flag staffman in a corps of surveyors employed by the "Dawes Commission" in the Indian Territory, which corps surveyed the line between said Territory and the States of Texas and Arkansas, and that by said line the place where the house in question was located was in Texas. The knowledge of this witness as to this survey, and the data upon which it was based, was purely hearsay. No governmental authority, certainly so far as Arkansas and Texas were concerned, was shown for this survey. For this reason it was inadmissible. 3 Wigmore on Evidence, 1665. It does not fall within the rule which permit surveyor's oral testimony to be admitted. 2 Enc. of Ev. p. 713. Testimony as to the actual location of the house, as to whether it was north or south of the former bank of Red River, was admitted on each side, and this was proper; and this conflict has gone to the jury upon proper instructions. Evidence of ancient public boundaries may be shown by general reputation, by tradition, and by hearsay declarations of persons with knowledge, made before the controversy arose. 2 Enc. of Ev. p. 722. None of the rejected evidence was entitled to admission under this rule.

It is also insisted that the evidence is insufficient to support the verdict, and fails to show that the appellant "knowingly permitted or suffered gaming to be carried on in said house with sufficient frequency to render him liable criminally for so doing." The court is of opinion that the evidence is amply sufficient to justify the finding of the jury. It would serve no useful purpose to review the testimony here. Other questions have been presented and considered, but no error is found in the trial.

The judgment is affirmed.