STATE *v.* BOWMAN.

Opinion delivered February 22, 1909.

STATE BOUNDARIES—CHOCTAW STRIP.—The Legislature of Arkansas having accepted the grant from Congress of the territory adjacent to Fort

Smith known as "the Choctaw Strip," by acts approved February 16, and March 14, 1905, the courts will not inquire whether the Legislature had authority to do so, but will treat such territory as part of the State.

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; reversed.

### STATEMENT BY THE COURT.

William Bowman was indicted by the grand jury of the Ft. Smith District of Sebastian County, Arkansas, at the December term, 1908, of the circuit court, for the crime of rape committed as follows, towit: "The said defendant in the county and district aforesaid, and in that part of the county and district aforesaid, described by act of Congress of the United States, approved February 10, 1905, and by the acts of the General Assembly of the State of Arkansas, approved February 16, 1905, and March 14, 1905, and which is more particularly described as follows: Beginning at a point on the south bank of the Arkansas River, one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses the said river, and running southwesterly along the south bank of the Arkansas River to the mouth of the Poteau; thence at right angles with the Poteau River to the center of the current of said river; thence southerly up to the middle of the current of the Poteau River opposite the mouth of Mill Creek and where it is intersected by the middle of the current of Mill Creek, thence up the middle of Mill Creek to the Arkansas State line; thence northerly along the Arkansas State line to the point of beginning," on the 12th day of October, 1908, upon one Ella Banks, a female, unlawfully, feloniously and forcibly did make an assault and her the said Ella Banks then and there forcibly and against her will did ravish and carnally know, against the peace and dignity of the State of Arkansas.

The defendant demurred to the indictment. The demurrer was sustained by the court. The State elected to stand on the indictment, and it was ordered quashed by the court for want of jurisdiction to try the same. A judgment was entered dismissing the case. The State properly saved exceptions, and has duly prosecuted an appeal to this court.

*William F. Kirby,* Attorney General, and *Daniel Taylor,* Assistant, for appellant.

The question here presented, that of the boundary between this State and Oklahoma, is more for political than judicial determination; and, the State, through her Legislature, having assumed political control over the territory involved in this action, it is not for the courts of the State to say whether such control is rightfully exercised. A citizen of the State, or one charged with crime committed within the limits of the disputed territory, can not question the jurisdiction of the courts over persons residing · or committing crimes, in the limits of such territory. Whether the dsputed territory is a part of Arkansas or of Oklahoma remains for the Supreme Court of the United States to settle, at the instance of the States themselves. 2 Pet. (U. S.), 254; 6 Pet. (U. S.), 710; 12 Pet. 517; 11 N. H. 2; 61 Me. 184; 100 U. S. 490; 3 R. I. 127; 64 Tex. 233.

*S. F. Lawrence,* for appellee.

Since the Constitution of 1874 fixes the permanent boundaries of the State, the Legislature is without authority by enactment to extend the limits of such boundary. 11 Ark. 167. Where the Legislature passes an unconstitutional act, the courts are bound to declare it void. 1 Ark. 590-593.

HART, J., (after stating the facts.) The demurrer to the indictment raises the question of whether the circuit court of Sebastian County for the Fort Smith District has jurisdiction to try persons for offenses alleged to have been committed over the land locally known as the "Choctaw Strip."

The act of Congress approved February 10, 1905 (United States Statutes at Large, vol. 33, page 714), entitled, "An act to extend the West Boundary of the State of Arkansas," reads as follows: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress Assembled that the consent of the United States is hereby given for the State of Arkansas to extend her western boundary line so as to include all that strip of land, in the Indian Territory lying and being situated between the Arkansas State line adjacent to the city of Fort Smith, Arkansas, on the Arkansas and Poteau rivers, described as follows, namely, beginning at the point on

the south bank of the Arkansas River one hundred paces east of old Fort Smith, where the western boundary line of the State of Arkansas crosses the said river, and running southwesterly along the bank of the Arkansas River to the mouth of the Poteau River to the center of the current of said river, thence southerly up the middle of the current of the Poteau River (except where the Arkansas line intersects the Poteau River) to the point in the middle of the current of the Poteau River opposite the mouth of Mill Creek, and where it is intersected by the middle current of Mill Creek, thence up Mill Creek to the Arkansas State line, thence northerly up the State line to the point of beginning, provided that nothing in this act shall be considered to impair any right now pertaining to any Indian tribe or tribes in said part of said Indian Territory under the agreements or treaties of the United States or to affect the authority of the Government of the United States to make any regulations or to make any laws respecting said Indians or their lands which it would have been competent to make or enact if this act had not been passed."

The act of Arkansas, approved February 16, 1905, entitled "An act extending the Western boundary line of the State of Arkansas over that strip of the Choctaw Nation between the Arkansas State line and the Poteau River, adjacent to Fort Smith, after reciting a part of the Act of Congress of February 11, above referred to, is as follows (Acts of Arkansas, 1905, page 124) : Section 1. "That the western boundary line of the State of Arkansas be and is hereby extended as follows, so as to include all the strip of land in the Indian Territory, lying and situated between the Arkansas State line and Fort Smith, Arkansas, and the Arkansas and Poteau rivers, described as follows, namely, beginning at the point on the south bank of the Arkansas River, one hundred paces east of old Fort Smith, where the west boundary line of the State of Arkansas crosses the said river, and running southwesterly along the south bank of the Arkansas River to the mouth of the Poteau, thence at right angles with the Poteau River to the center of the current of the said river, thence southerly to the middle of the current of the Poteau River (except where the Arkansas State line intersects the Poteau River) to a point in the middle of the current of the Poteau River opposite the mouth of Mill Creek and where it is

intersected by the middle of the current of Mill Creek, thence up the middle of Mill Creek to the Arkansas State line, thence northerly along the Arkansas State line, to the point of beginning."

By comparison of the description used in the indictment with that of the act of Congress and of our Legislature above quoted, it will be seen that there is no uncertainty or confusion as to the lines, and that the boundary has been fixed and established by the acts referred to, but it is contended by the appellee that the act of Congress and that of our Legislature did not have the effect of extending the boundary to the lines designated in the acts in question. The indictment charges that the crime was committed in the spot locally known as the "Choctaw Strip" and within its precise limits as defined by the act of Congress and that of our State Legislature. Thus it will be seen that the piece of territory within which the crime has been charged to have been committed has defined limits, is known by a name, and the political authorities have exercised jurisdiction over it.

In the case of *State* v. *Wagner,* 61 Me. at p. 184, the court said:

"And in cases where the political authorities of the State have actually claimed and exercised jurisdiction over particular localities the doctrine of the law seems to be that the courts are thereby concluded, and have only to declare the fact and govern themselves accordingly, without undertaking to pass upon the validity of such claim."

In the case of *Harrold* v. *Arrington,* 64 Texas, 233, the court used this language:

"Whether or not Greer County is a part of the State of Texas depends upon where the northern boundary line of our State, dividing it from the Indian Territory, should be located. This is a question to be settled by the political and not the judicial department of our State Government. It is judicially known to us that the political authority has always claimed the territory composing Greer County as part of the domain of our State, and has exercised acts of control over it; such as organizing it into a county and attaching it to another of our counties for judicial purposes, etc. We can not undertake to limit the jurisdiction thus recognized and asserted by the political department, and,

until that department ceases to exercise such authority, we must treat this county as subject to the jurisdiction of the State of Texas."

In the case of *State* v. *Dunwell,* 3 R. I. 127, the Supreme Court in settling a question of boundary said: "Where the line is *de jure* is a political question with which the courts of the State will not intermeddle. Sufficient for them is it that the State has always claimed jurisdiction up to and 'along the easterly side of bank' of the Seekonk River, and exercised it in fact. The courts are bound to take cognizance of the boundaries in fact claimed by the State."

In the case of *Bedel* v. *Loomis,* 11 N. H. 9, the court said:

"Where the Legislature of the State has asserted a right of jurisdiction within certain limits, it is not competent for this court to examine into the matter, and circumscribe the jurisdiction by a decision that the boundaries do not extend so far."

Our attention has not been called to, and we have not been able to find, any other decisions by any of the State courts where the precise question here involved has been determined. The reasoning of these cases has been by analogy that adopted by the courts of the United States.

In the case of *Jones* v. *United States,* 137 U. S. 202, Mr. Justice Gray, who delivered the opinion of the court, said: "All courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose laws they administer."

In the case of *Foster* v. *Neilson,* 2 Peters (U. S.) 254, the question was raised as to the legality of the national boundary as fixed by the treaty of St. Ildefonso, and it occupied the same relation in that court that the case at bar occupies in this court. Marshall, C. J., speaking for the court, said: "After these acts of sovereign power over the territory in dispute asserting the American construction of the treaty by which the government claims it, to maintain the opposite construction in its own courts would certainly be anomaly in the history and practice of nations. If those departments which are intrusted with the foreign intercourse of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights to dominion over a country of which it is in possession,

and which it claims under the treaty; if the Legislature has acted
on the construction thus asserted, it is not in its own courts that
this construction is to be denied. A question like this, respecting
the boundaries of nations, is, as has been truly said, more a polit-
ical than a legal question, and in its discussion the courts of every
country must respect the pronounced will of the legislature."

In *United States* v. *Arredondo,* 6 Pet. (U. S.) 691, Chief
Justice Marshall, who delivered the opinion of the court, in refer-
ring to *Foster* v. *Neilson,* said: "This court did not deem the set-
tlement of boundaries a judicial but a political question—that it
was not its duty to lead, but to follow the action of the other de-
partments of the government."

In the case of *United States* v. *Texas,* 143 U. S. 621, the At-
torney General of the United States brought an original suit
against the State of Texas in the Supreme Court of the United
States to determine whether Greer County was within its borders,
or in the Territory of Oklahoma. It was urged in that case that a
question of boundary between a Territory of the United States and
one of the States was of a political nature, and not susceptible of
judicial determination. The court held otherwise, and based its
decision upon section 2, art 3, of the Constitution of the United
States, which gives to the Supreme Court of the United States
original jurisdiction of suits brought by a State against citizens of
another State and of controversies between two or more States.
Therefore it was determined that the Supreme Court of the Uni-
ted States, under the Constitution, take cognizance of an orig-
inal suit brought by the United States against a State to deter-
mine the boundary between one of the Territories and such
State.

It has been repeatedly held by the Supreme Court of the
United States that it had, under the clause of the Constitution
last referred to, original jurisdiction of a controversy between
States involving a dispute respecting their boundary lines.
*Louisiana* v. *Mississippi,* 202 U. S. 1; *Missouri* v. *Illinois,* 200 U.
S. 496 and cases cited; *Rhode Island* v. *Massachusetts,* 12 Peters
(U. S.) 657. Thus it will be seen that the Supreme Court of the
United States has held that the question of boundaries between
independent nations is a political question, and that questions of
that character arising between the general government and one

of the States or between two States is a judicial one because made so by the constitution of the United States. From these principles it seems to us that it necessarily follows that when the State asserted its authority over the piece of territory commonly called the "Choctaw Strip," its courts should treat such territory as a part of their lawful jurisdiction and should administer the law there as is done in any other part of the State.

The grant of the strip in question by Congress, its acceptance by our Legislature and the subsequent exercise of authority by the State makes the question a political and not a judicial one, and the courts of the State must treat that as conclusive of the question of boundary.

The question here involved must not be confused with the many cases where courts are called upon to determine whether they have jurisdiction of a particular case on account of uncertainty as to where the State boundary is. This court recently considered such a case in *DeLoney* v. *State,* 88 Ark. 311.

In such cases the State is asserting sovereignty only to the true line, and the inquiry is to ascertain where the true line is. In the present case the State is asserting sovereignty over a certain locality under grant from National and State legislatures conferring sovereignty to the State over it. The courts will not inquire whether the grants are valid, for the political department of government has elected to exercise sovereignty there; but where the State has elected to exercise sovereignty to a definite line, then the courts may properly determine where such line is.

When this distinction is borne in mind, there is no conflict in the decisions touching this question.

Therefore, the judgment is reversed, and the cause remanded with directions to overrule the demurrer to the indictment.