ADKISSON *v.* STARR.

5-132                              260 S. W. 2d 956

Opinion delivered June 22, 1953.

Amended on Denial of Rehearing October 19, 1953.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Clark & Clark* and *Wallace Townsend,* for appellee.

GEORGE ROSE SMITH, J.  This is a suit between adjoining riparian landowners to obtain a division of about 1,200 acres of land that was formed by accretion as the channel of the Arkansas River gradually shifted westward.  The appellants, defendants below, and their predecessors in title have long owned riparian land (referred to as the Adkisson place) in Section 13, Township 3 North, Range 14 West.  The appellee and his predecessors have owned the adjoining farm to the south, known as the Rector place and lying in Sections 24, 25, and 36.  The recession of the river over a period of more than fifty years exposed the lands now in dispute, which lie directly west of the original farms.  The chancellor divided the new land by extending the common boundary (the south line of Section 13, which is also the north line of Section 24) due west across the area in controversy.  The appellants contend that all the disputed acreage became their property by accretion, or, if it did not, that they have acquired title by adverse possession.

The voluminous record gives a pretty complete history of the shifting of the river in this vicinity. When the United States finished its survey in 1856 the river flowed southward through the four sections mentioned above, so that each section was then fractional. Apparently the river had long occupied this bed, for on the east its bank was so high that it is sometimes called a bluff.

The next survey, made in 1900, shows that the river had begun to move westward. This plat reveals an extensive sandbar on the east side of the river in Sections 13 and 24, indicating that the river's movement to the west began in those sections. According to this survey Palarm Creek, which is an important factor in this litigation, came down from the northeast, crossed the sandbar, and emptied into the river at about the center of Section 13, which is part of the Adkisson place.

As this segment of the river continued to shift to the west Palarm Creek did not extend its channel in a direct line to reach the river. Instead, at some time not fixed by the proof the creek turned southward in Section 13 and flowed parallel to the river for two or three miles before joining the river some miles below the original mouth of the creek. In so paralleling the larger stream the creek for the most part followed the old river bed, but in doing so it left a strip of accreted land between the creek bed and the bluff bank on the east. The lands now in dispute comprise a long V-shaped peninsula bounded on the north by the Adkisson place, on the west by the Arkansas River, and on the east by Palarm Creek, with the Rector place lying on the east side of the creek in the lower three of the sections mentioned.

As a preliminary matter a jurisdictional question was raised in the oral argument, although it is not urged in the briefs. All the land actually in dispute lies in Faulkner County, since in this vicinity the line between that county and Pulaski County runs down the river to the mouth of Palarm Creek and thence up that creek, with the land between the two streams being a part of Faulkner County. Act 59 of 1875, Adjourned Session. Although part of the disputed land lay in Pulaski County

before the river shifted to the west, the rule is that a boundary line defined by a watercourse follows a gradual change in the course of the stream, though the boundary is not affected by a sudden avulsion. *DeLoney* v. *State,* 88 Ark. 311, 115 S. W. 138.

Nevertheless we think the Pulaski Chancery Court had jurisdiction, for the complaint also asked the court to apportion the narrow band of accretion lying between Palarm Creek and the bluff bank. That strip is east of the creek and is therefore in Pulaski County. It happens that the defendants concede the plaintiff's title to this strip, and perhaps the defendants could have disclaimed ownership of the Pulaski County land and insisted that the real controversy be tried in Faulkner County. But the defendants acquiesced in the plaintiff's choice of the forum, and the decree has the effect of awarding the Pulaski County land to the appellee. It follows that the suit involves the title to land in both counties; so the venue may be laid in either county. Ark. Stats., 1947, § 27-601.

On the merits the appellants first contend that the disputed acreage accreted entirely to their land in Section 13. This argument is based on the fact that the original Rector place lay entirely east of Palarm Creek and is now separated by that stream from the land in controversy. The Adkisson place, on the other hand, lay on both sides of the creek to the north, and it is therefore argued that the appellants' ownership extended southward and westward as the recession of the river built up land between the two watercourses.

This identical argument was rejected in *Dowdle* v. *Wheeler,* 76 Ark. 529, 89 S. W. 1002, 113 Am. St. Rep. 106. There, as here, a river had slowly shifted away from adjoining littoral properties, and later on a smaller stream occupied the old river bed and blocked Mrs. Wheeler's access to the accretion that lay in front of her property. In upholding Mrs. Wheeler's title we stressed the fact that a narrow strip of the accretion lay between her property and the creek. ''This goes to show that there was a deposit against the shore line be-

fore the waters of the river receded, that this process continued until the bed of the river rose to the level of the creek's bed, and that then, as the waters of the river receded, the flow from the creek prevented further deposits in its extended channel, and established a permanent channel along the old bed of the river.''

On its material facts this case cannot be distinguished from that one. The 1900 plat shows that Palarm Creek then entered the river in Section 13, but a sandbar had already begun to build up along the shore of the Rector place. Witness after witness confirmed the existence of accreted land between the creek's new bed and the old bluff bank. Aerial photographs put the matter wholly beyond controversy. We can think of no reasonable theory to account for this physical situation except that advanced in the *DeLoney* case, to the effect that the river first left a shelf of accretion against the appellee's property and that later Palarm Creek turned southward and established a new channel on that shelf. It is necessarily true that the new channel was bounded on both sides by accretions already a part of Rector place, and for that reason all later accretions to the west also became a part of the appellee's property.

A much more difficult question is presented by the appellants' proof of adverse possession. Except in rare seasons of extreme drought Palarm Creek is a formidable barrier that cannot be conveniently crossed without a boat. Hence the appellee has been cut off almost continuously from his part of the land in dispute, the only access having been from the Adkisson place to the north. Hence about the only dominion that has been exercised over the newly formed acreage has been that of the appellants and their predecessors. We agree with the chancellor, however, in thinking that the proof does not show sufficient acts of ownership to work an investiture of title in the appellants.

The claim of adverse possession rests mainly upon the assertion that the owners of the Adkisson place have long maintained a fence on their side of Palarm Creek. If so, the area in controversy was effectively enclosed

by this fence on the east, by the appellants' property on the north, and by the Arkansas River on the west. We have carefully studied every reference in the record to this alleged fence, but we are unable to spell out any period during which the fence is shown to have been maintained for seven successive years, even disregarding temporary breakages caused by flood waters.

One witness, who was familiar with the property from about 1907 until 1917, testified that there was a fence along the creek during those years, but three other witnesses whose testimony related to part or all of this period gave evidence to the contrary. The next mention of this fence is in the testimony of R. E. Dent, who owned the Adkisson place from 1917 until 1930. Dent says that he fenced the west side of the creek in 1917 or 1918, that an overflow covered the fence, and that he fenced a second time. Yet he does not specify the location of the fence nor say how long it remained in place. J. C. Cook was a tenant of Dent's in 1923 and says that there was then a fence on the west side of the creek, but he gives no details whatever.

Ed Fisher, Dent's overseer from 1923 until 1930, testified that a fence was erected in 1924, but he was unable to say how far it extended down the creek. "Nearly every year we took willow posts and put a fence in there to keep from pulling [cattle] out of that creek. . . . We run it around a slough." Fisher's positive statement that a new fence was put up in 1924 carries the implication that Dent's fence of 1917 or 1918 no longer existed. It may also be inferred from Fisher's language and from other testimony that the 1924 fence was not a continuous barrier but was instead a series of fences put up only where it was necessary to keep cattle from being mired in the various bogs in the creek bed. All this fencing seems to have consisted of two or three strands of barbed wire nailed to trees, and had the fence been of much permanency it seems that more evidence of its location would have survived than is reflected by this record.

There is practically no reference to the existence of any fence from 1930 to 1935. To the contrary, two of the appellants' witnesses pulled cattle out of the bog in 1932, which tends to negative the maintenance of a fence in that year. To the same effect is the clear-cut testimony that an entirely new fence was built by the Adkissons in 1935. That one was swept away by a flood in the same year, was replaced a year or two later, and the replacement has been kept in repair ever since. But the appellee tolled the statute of limitations in 1941 by bringing suit in Faulkner County for a division of these lands. By tacit agreement that suit has been allowed to lie dormant, but of course its pendency eliminates the issue of adverse possession from 1941 to the present.

The above is the testimony most favorable to the appellants, but there is fully as much evidence to the contrary, much of which was given by the appellants' witnesses. George Irby had lived on the Adkisson place for forty years. He helped put up the 1935 fence, but he could not remember any other fence having been on the west side of the creek. Marshall Mainard said that for fifty years he had been almost as familiar with the Adkisson place as with his own land across the river, but he had no knowledge that a fence existed in the 1920's or the 1930's. We need not detail many other instances in which corroboration might have been expected but was not produced. At most we can say only that the testimony is so evenly balanced that we find it impossible to discern a preponderance in either direction. In this situation it is our practice to be guided by the chancellor's conclusions.

If, as we must conclude, the land was unenclosed from time to time, there is not much other proof of adverse possession. The appellants naturally had no color of title to these accretions; so they are not aided by the rule that actual possession of part of a tract carries with it constructive possession of the whole. It was therefore incumbent upon them to show actual physical possession of this unenclosed acreage. This is a burden of proof hard to sustain, for by their nature these lands

did not readily yield to actual possession. The advancing edge of the accretion consisted at first of sandbars not susceptible of agricultural use. (In 1939 a survey showed that sandbars comprised 588.14 of the total 1,239.80 acres of accretion.) It necessarily took time for the sandbars to be converted into soil by deposits of silt and by the growth of vegetation. The testimony and the photographs in the record convince us that the land has remained almost entirely unimproved. The appellants allowed their cattle to roam over the bar, and wild hay was cut now and then. But substantial growths of timber are shown by the pictures, and one of the appellants states that in 1948 trees were cut that exceeded twelve inches in diameter at the stump.

Small fields were planted to corn in some years, but the proof does not establish the location of any field before the 1939 survey. The witness Moreland estimated that eleven acres on the bar were cultivated in 1925. Troy King thought there were from seven to twelve acres in corn in 1936; one of the appellants put the figure for that year at thirty-five acres. These fragments of cultivation certainly do not show the required actual occupancy of more than twelve hundred acres.

There is much proof that the bar was generally considered to be part of the Adkisson place, and that conclusion was plausible enough. The peninsula was separated from the Rector place by Palarm Creek and could be conveniently entered only from the north. But as a matter of law the title rested in the appellee, and much more than a subjective belief of ownership is necessary to the acquisition of title by prescription. We have no doubt that the appellants believed themselves to be the owners of this land and that pursuant to that belief they intermittently exercised acts of ownership over various small and unspecified patches of the property. They, however, had the burden of proving their claim of title, and we are not willing to override the chancellor's judgment upon the basis of testimony that leaves us with serious doubt as to the merit of their position.

The appellants also have a State tax deed to part of the property, but it is based upon tax forfeitures that occurred while the land was being assessed in Pulaski County. Whatever title the State acquired was extinguished when the river gradually edged across the property and by reliction added it to lands in Faulkner County. It follows that when the State executed its deed in 1948 it had no title to convey.

Affirmed.

WARD, J., dissents.