George McGEE, Plaintiff,

v.

Albert MATTHEWS and A. L. Nuckols, Defendants and Third-Party Plaintiffs,

CHICAGO MILL & LUMBER COMPANY, Third-Party Defendant.

No. PB 62–C–13.

United States District Court
E. D. Arkansas,
Pine Bluff Division.
May 12, 1965.

citizen of the State of Mississippi, and the defendants A. L. Nuckols, Albert Matthews and Geraldine Matthews,[1] his wife, citizens of Arkansas. The matter in controversy is the ownership of lands on the concave side of an oxbow lake formed by a cutoff in the Arkansas River. The oxbow lake is sometimes referred to as "Bicker's Bend" and sometimes as "Taylor's Old Lake." The lands in issue are referred to as Diamond Point.

The area of land known as Diamond Point on the Arkansas River occupies approximately eight hundred acres in the geographical site that was originally occupied by Section 34 and parts of Sections 33 and 35, Township 7 South, Range 4 West, and parts of Sections 2, 3 and 4 of Township 8 South, Range 4 West as surveyed by the United States Government in 1829. Prior to 1943 the area was bounded on the west, south and east by an oxbow bend on the Arkansas River, but in that year a cutoff occurred which created the oxbow lake that is now known as "Taylor's Old River" or "Bicker's Bend."

The plaintiff George McGee deraigns title to a portion of Sections 7, 17 and 18, T 7 S, R 4 W, Jefferson County, Arkansas, and contends that the lands in issue formed as accretions to those sections. Plaintiff had also paid taxes in Jefferson County on these lands continuously since 1938 to date and since 1949 with particular reference to a survey and plat thereof recorded in Plat Book 4, page 164, of the Jefferson County records.

Daggett & Daggett, by W. H. Daggett, Marianna, Ark., for plaintiff.

John Harris Jones, Pine Bluff, Ark., Osro Cobb, A. L. Barber, of Barber, Henry, Thurman & McCaskill, Little Rock, Ark., for defendants.

GORDON E. YOUNG, District Judge.

This is a diversity of citizenship action between the plaintiff George McGee, a

The defendants Albert Matthews, et ux, deraign title from a State tax deed,[2] dated July 27, 1949, conveying the Frl NW-¼ of Section 34, T 7 S, R 4 W, Lincoln County, Arkansas, and contend that all of the other lands on Diamond Point are accretions to said Frl NW-¼. The pleadings acknowledge that the claim of Matthews, et ux., is subject to the rights of the co-defendant A. L. Nuckols.

1. Geraldine Matthews, wife of Albert Matthews, was made a party defendant by oral stipulation of the parties in open court and in her presence.

2. According to the deed the taxes forfeited for the nonpayment of taxes in Lincoln County for the tax year of 1927.

The defendant A. L. Nuckols claims title to the Frl NE-¼ and S-½ SE-¼ of Section 33, and SW-¼ of Section 34, T 7 S, R 4 W, Lincoln County, Arkansas, by virtue of a State tax deed[3] dated June 22, 1953. Defendant Nuckols also claims title by virtue of a deed from M. P. Price and wife to the Frl NE-¼ of Section 33 and the Frl S-½ of Section 34, which title he traces back to the United States Government. Nuckols claims all of the remainder of the lands on Diamond Point as accretions to those calls, but acknowledges that said claim is subject to the rights of co-defendants Albert Matthews, et ux.

Since the plaintiff claims under a chain of title originating in Jefferson County, Arkansas, and the defendants claim under a chain of title originating in Lincoln County, Arkansas, the Court, to resolve the issues of ownership, needs to determine the location of the boundaries between Jefferson and Lincoln Counties. However, since the parties agree:

(1) That the middle of the main channel of the Arkansas River was the boundary between Jefferson and Lincoln Counties in 1871 when Lincoln County was formed;[4] and

(2) That boundaries between counties, like the boundaries between individual landowners, move with those gradual changes of the main channel which come about by accretion but not where the change comes about suddenly by avulsion; Deloney v. State, 88 Ark. 311, 115 S.W. 138; Nix v. Pfeifer, 73 Ark. 199, 83 S.W. 951;

it follows that the real issue between the parties is whether Diamond Point was formed by a change of the River resulting in the excavating, passing over, and then filling the intervening space between its old and new channels, which would be an accretion process; or whether the change was brought about by a sudden avulsion which left intact the land between the old and new channels.

All parties agree that when the original government surveys[5] were made the Arkansas River ran to the north of the area in question, that a bend in the River developed, and that the River migrated southward until a cutoff occurred in 1943 at the neck of the bend which resulted in the formation of the oxbow lake known as "Bicker's Bend."

The plaintiff, to support his contention that the southward migration of the River was by accretion, relies upon the testimony of L. C. White and Austin Smith.

Mr. L. C. White, a graduate forester and manager of Chicago Mill and Lumber Company, testified that Chicago Mill and Lumber Company had just recently (1963) cut the timber on Diamond Point and that the cutting records[6] showed that the timber removed therefrom was as follows:

| Box Elder | 1 Log |
|---|---|
| Cottonwood | 5,932 Logs |
| Soft Elm | 2 Logs |
| Sycamore | 99 Logs |
| Willow | 329 Logs |

He had counted the rings of the trees to determine the age of the trees cut, and 99% were from 32 to 40 years of age. The oldest tree that he could find was 42 years of age. He did not observe any indication of trees having been cut in 1941 or 1942—which would have been evidenced by stump holes. Nearly all the timber cut was cottonwood and willow, which are primary species of tim-

---

3. It appears that after the consummation of the unlawful detainer litigation between the present plaintiff and defendant Nuckols in Case No. 2735 in this Court [McGee v. Nuckols, (E.D.Ark.1955) 136 F.Supp. 948], Nuckols on July 10, 1957, obtained from the State Land Commissioner a refund of the money paid for his tax deed. On September 28, 1964, Nuckols obtained a redemption deed from the State Land Commissioner to cover the lands described in the deed from M. P. Price.

4. Ark.Acts 1871, No. 68.

5. Original land surveys of the area were made by the United States Government in 1819, 1829 and 1846.

6. The timber cut was limited to 12 inches at the little end.

ber; that if all of the timber had been cut off in 1941, the secondary species such as hackberry and elm would have been the predominant growth in 1963.

Mr. White pointed out that according to the ecology of the forest, timber does not spring up haphazardly on newly formed lands, but follows a rather definite pattern of appearance, growth, maturity, death, and succession. The types of trees which first appear and establish themselves are known as "primary species," those which follow are referred to as "secondary species," and these in turn are followed by the "climax species" which will make up the permanent forest on the land as long as the climate remains unchanged.

He also said that when accretions are formed in the alluvial river bottoms they are at first simply mud, but as times goes on vegetation appears. The first species of trees to occur are willow and cottonwood, which are tolerant of water, and which receive in such locations supplies of sunlight adequate to their needs; while willow and cottonwood are tolerant of water, they are intolerant of shade and will not establish successive stands in the same location. As the willow and cottonwood grow to maturity the secondary species such as hackberry, elm and ash, which are more tolerant of shade, spring up beneath the willow and cottonwood; and as the willow and cottonwood disappear, the secondary species take over, to in turn give way to the climax species, usually oak, hickory or gum, the seedlings of which grow readily in the shade of their parent tree.

Based upon the ecology of the forest, the cutting records of Chicago Mill and Lumber Company, and his familiarity with the area, it was Mr. White's opinion that all of the lands on Diamond Point were newly formed lands.

With respect to the large cottonwood tree shown in the picture presented by defendants, it was Mr. White's testimony that due to its increased exposure to sunlight an open growing forked cottonwood tree, up to the point of the fork, would grow as much as two inches in diameter per year.

Mr. Austin Smith, a potamologist, introduced twelve exhibits showing government surveys made of the area in 1819, 1829, 1846, 1884, 1917, 1931, 1937 and 1943. He showed that riparian fractional Section 17, T 7 S, R 4 W, north of Arkansas River, was surveyed in 1819; that riparian fractional Section 18, T 7 S, R 4 W, north of Arkansas River was surveyed in 1846; and that in the 27 years between the 1819 and 1846 surveys, the Arkansas River had built 200 feet of bank height accretions to the north bank of the Arkansas River at west line of riparian fractional Section 17. On the 1884 survey, which is sometimes called the "Taber Survey," Mr. Smith superimposed the approximate locations of riparian fractional Sections 17 and 18, north of Arkansas River. He also pointed out that the 1885 Annual Report of Chief Engineers stated that the 1884 survey of the Arkansas River itself was more accurately surveyed by triangulation, whereas the overbank areas and topography were obtained by less accurate compass lines. Mr. Smith found the Arkansas River conditions in 1884 favorable for the River to continue its southward migration in the Diamond Point area.[7] The 1917 survey shows that the Arkansas River had migrated southward until only a portion of the southeast corner of Section 33 remained on the south side of the Arkansas River, and that in fact the River had eroded into Sections 3 and 4, T 8 S, R 4 W. On this survey is the notation that the "Douglas Cut-off" occurred "May 30, 1909." On this survey of the area in question timber is indicated by symbols, and the word "willow" is written inside of the usual timber symbols. Also, the topographical lines show a high steep bank

7. On cross-examination, defendants took issue with Smith's location of fractional Sections 17 and 18—their contention being that the Arkansas River was actually eroding to the north, but Smith defended his locations as having been made with reference to known landmarks such as the bend in Bayou Meto.

on the western or upstream side of Diamond Point and a sloping accretion-type bank on the southern and eastern sides. The 1931, 1937 and 1943 surveys show the subsequent enlargement of the southern part of the bend and the closure and subsequent cutoff at the neck which resulted in the forming of the oxbow lake.

Based upon the history available, his interpretation of the government surveys, and his knowledge of the Arkansas River,[8] it was Mr. Smith's opinion that the southward migration of the Arkansas River and resultant forming of Diamond Point was by the process of accretion.

The defendants, to support their contention that the southward migration of the Arkansas River was in part by an avulsion sometime between 1909 and 1917, rely upon the testimony of William Hall, John Holland, Robert Nowden, James Monroe Watson, Creed L. Ringo, Walter Nuckols, A. L. Nuckols, Albert Matthews, G. A. Langhofer, and Leo Tyra.

Mr. William Hall, aged 76; Mr. John Holland, aged 72; and Mr. Robert Nowden, aged 78—all of whom had lived at South Bend Plantation during the years in question—testified that there was an island on South Bend Plantation called the "little field" on which five families lived; that a little cutoff came in there sometime in 1915 and 1916; and that they went back over there in 1964 with Mr. Matthews and Mr. Nuckols and found a pump that looked like it was in the same spot where the five families lived.

Mr. James Monroe Watson, aged 39, testified that he was in a work crew that cut all of the cottonwood timber, 20 inches and up at the stump, off Diamond Point in 1941 or 1942.

Mr. Creed L. Ringo, aged 63, and Mr. Walter Nuckols, aged 66, testified that they hunted on Diamond Point from 1924 to 1930 and that they observed an old

field and a levee that looked like it had been built with a wheelbarrow.

Defendant A. L. Nuckols, aged 69, testified that he had been familiar with Diamond Point since 1924, and that there was an old levee and that at that time you could see old rows of cotton and corn. He also identified a picture of a pitcher pump made in 1963.

Defendant Albert Matthews testified his farm was directly across the River from Diamond Point. The part he claims to be Frl NW-¼ of Section 34 is in the center of Diamond Point. He said he counted 63 rings in a tree on the land in question this year. Mr. Matthews said his lawyer hired a forester named Davis, who said he found one tree 48 years old. However, this forester was not called as a witness.

Mr. G. A. Langhofer, a retired Area Engineer for the U. S. Army Corps of Engineers, first became acquainted with Diamond Point area in 1925. Residents who had lived there for many years had told him that the River had moved over and cut off an area which had been part of the farm. He was of the opinion that before 1909 the Arkansas River was north of the field on Diamond Point and that when the Douglas Cut-off occurred, the River built up pressure and cut across into a chute shown on the 1829 survey in the NW-¼ of Section 34, leaving a portion of the so-called "little field" of South Bend Plantation intact on the north side of the Arkansas River.

Mr. Leo Tyra, aged 39, engineer graduate of the University of Texas, worked for the Corps of Engineers from 1955 to 1960, and is now City Engineer for the City of Pine Bluff, Arkansas. He stated his opinion to be that the Arkansas River tended to maintain equal pressure points which are brought about because of points of impasse where the River is unable to erode away the soil. Based upon the foregoing and the further assumption that such a point of impasse existed on

8. Mr. Smith has worked for the U. S. Army Corps of Engineers for 25 years in connection with river bank stabilization and flood control. He is now working out of the Vicksburg, Mississippi, District.

Diamond Point, it was Mr. Tyra's opinion that a cutoff or avulsion occurred sometime before 1917 which left intact a portion of the Frl NW-¼ of Section 34, T 7 S, R 4 W.

Obviously all of the testimony cannot be reconciled. Much of the testimony concerns old River surveys, opinions, speculation and surmise by witnesses of what may have occurred many years ago. Of all this testimony, the Court thinks that of Mr. Smith the most persuasive.

However, there is no speculation about the kind and age of timber on the lands in 1963. We think that Mr. White's testimony as to the ecology of the forest based on these known facts, added to that of Smith, demonstrates clearly that the Arkansas River migrated southward by the process of accretion, and the Court so holds.[9]

The Court therefore finds and concludes that the area known as Diamond Point is an accretion to Sections 17 and 18, T 7 S, R 4 W. Since under the law of Arkansas, the boundaries of counties located in the thalweg of a river move with the migration of the river which comes about through the process of eroding away, passing over and filling in of the area between the old and new channels, it also follows that the lands are located in Jefferson County, Arkansas. Furthermore, since government land calls go out of existence when wholly engulfed by the shifting bed of the river, Younts v. Crockett, 238 Ark. 971, 385 S.W.2d 928 (1965), it follows that the tax deeds obtained by the defendants and other titles originating from the lands in Lincoln County, Arkansas, and so engulfed by the Arkansas River are invalid and of no effect.

The 1931 government survey shows an island or sand bar located in the SE-¼ of Section 33 and the SW-¼ of Section 34, which the defendants claim as a restoration under Ark.Stats. § 10–202, which provides as follows, to-wit:

"All land which has formed or may hereafter form, in the navigable waters of this State, and within the original boundaries of a former owner of land upon such stream, shall belong to and the title thereto shall vest in such former owner, his heirs or assigns, or in whoever may have lawfully succeeded to the right of such former owner therein."

In Gray v. Malone, 142 Ark. 609, 219 S.W. 742, it was held that the above statute had no application to lands built up to the mainland as accretions.

In Mills v. Protho, 143 Ark. 117, 219 S.W. 1017, it was held that one acquiring title to an island under the above statute could not claim accretions outside of his original boundaries.

The only testimony with respect to the alleged island other than the survey itself was that of Mr. Smith, who stated that since the area did not appear as an island on any other survey it was his opinion that the area was in fact part of the accretions to the left descending bank and separated therefrom merely by an accretion swale, and only appeared as an island on the 1931 survey because of the stage of the River at the time of the survey. The Court is of the opinion that this is correct.

Since defendants, during argument, conceded that their evidence was insufficient to sustain a claim of adverse possession on their part if the lands were determined not to be in Lincoln County, Arkansas,[10] the above findings and conclusions dispose of this litigation and make it unnecessary for the Court to determine whether there is sufficient evidence to sustain the plaintiff's alleged adverse possession.

---

9. Ussery v. Anderson-Tully Co., (E.D.Ark. 1954) 122 F.Supp. 115, contains a complete discussion of the problems involved in connection with the migration of the Arkansas and Mississippi Rivers and the types and kind of evidence used to prove the method of formation of lands thereon, including the testimony of foresters such as Mr. White.

10. Defendants' concession on this point was obviously correct.

The third party complaint of the defendants against Chicago Mill and Lumber Company for timber removed from Diamond Point during the pendency of this action pursuant to a contract with plaintiff McGee must also fall with their title.

The Court will enter judgment quieting title to all of Diamond Point in the plaintiff McGee and dismissing the third party complaint against Chicago Mill and Lumber Company.