The Honorable Charlie Daniels Commissioner of State Lands State Capitol Little Rock, Arkansas 72201
Dear Mr. Daniels:
This is in response to your request for an opinion regarding the ownership of certain land located in the Arkansas River. Specifically, you have enclosed a copy of a letter from a Fort Smith attorney asking whether the State "claims title to the former beds of the Arkansas River which were cut off as a result of the channelization of the river by the Corps of Engineers in the 1960s." The letter refers to an area known as the "Trustee Bend Cutoff," which is described in the letter as "literally a channel created by the Corps of Engineers into which the body of the Arkansas River was diverted. The letter notes that "[t]he former bed of the Arkansas River which was cut off by this channel was described as the Trustee Bend." The letter continues by stating that: "the former bed of the Arkansas River commonly described as Trustee Bend was completely cut off as a result of the channelization, i.e., there is now no access to it from the Arkansas River with the possible exception of extreme flooding conditions. Portions of the former bed of the river are now dry land; other portions remain underwater." The letter poses the following question to your office, which you have now forwarded for my opinion:
 Given the foregoing facts, does the State of Arkansas claim title to the oil, gas, and minerals underlying the bed of the Arkansas River as it was formerly located before it was cut off by the channelization of the Arkansas River? In responding to this inquiry, I specifically refer you to the following cases:
 Porter v. Arkansas Western Gas, 252 Ark. 958, 482 S.W.2d 598 (1972); United States of America v. Keenan, 753 F.2d 681 (8th Cir. 1985).
You state that "[i]n reviewing the information provided, as well as relevant case law, it would appear that if the Trustee Bend Cutoff[1]
is no longer navigable, then ownership of the channel would revert to the riparian owners and the state would no longer claim it." You state that you are reluctant, however, to issue your opinion on this matter, particularly as it relates to oil and gas rights, as the "Natural Resources Commission" has "exclusive authority over the leasing of oil and gas rights owned by the state."[2] You therefore ask my opinion "in response to the inquiry [the letter of the attorney] enclosed."
I must note in response to your request that the question posed by the Fort Smith attorney ("[w]hether or not [the state] claims title to the former beds of the Arkansas River"), is not a question of law upon which I can issue a formal legal opinion.
The underlying question is whether the State of Arkansas owns title to the bed of the Trustee Bend. Questions involving the title to beds of navigable rivers are fact intensive. See e.g. 65 C.J.S. NavigableWaters, § 3. In the issuance of official legal opinions, I am not empowered or equipped to act as a factfinder, and to definitively determine an issue based upon a statement of the facts given by one party to the dispute (such as posed in the letter enclosed with your request).
In an effort to be helpful, however, I can set out the relevant law on the topic, which may then be applied to the facts as you find them.
The State of Arkansas, of course, owns title to the beds of all navigable waterways within the state. See Hayes v. State, 254 Ark. 680,496 S.W.2d 372 (1973); Clarke v. Montgomery County, 268 Ark. 942,597 S.W.2d 96 (Ark.App. 1980); McGahhey v. McCollum,207 Ark. 180, 179 S.W.2d 661
(1944); Barboro v. Boyle, 119 Ark. 377, 178 S.W. 378 (1915); State v.Southern Sand Material Co., 113 Ark. 149, 167 S.W. 854 (1914). It has been stated that:
 When the Original Colonies ratified the Constitution, they succeeded to the Crown's title and interest in the beds of navigable waters within their respective borders. See Utah Division of State Lands v. United States, 482 U.S. 193, 195-96, 107 S.Ct. 2318, 2320-21, 96 L.Ed.2d 162
(1987); Bonelli Cattle Co., v. Arizona, 414 U.S. 313, 317-318, 94 S.Ct. 517, 521-522, 38 L.Ed.2d 526 (1973), overruled on other grounds, Oregon ex rel. State Land Board v. Corvallis Sand Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed. 2d 550 (1977). Under the equal footing doctrine, new states were admitted with `the same rights, sovereignty and jurisdiction . . . as the original States possess within their respective borders.' Bonelli, 414 U.S. at 318, 94 S.Ct. at 522. Accordingly, title to lands beneath navigable waters passed from the federal government to the states upon their admission to the Union.
101 Ranch v. U.S., 905 F.2d 180, 182 (8th Cir. 1990).
This is true assuming there had been no valid federal grant of particular land to an individual prior to the state's admission to the Union. UtahDivision of State Lands v. United States, supra.
While the application of the "equal footing doctrine" to the states at the time of their admission to the Union requires reference to and construction of federal law, thereafter the role of the equal-footing doctrine is ended, and the land is subject to the laws of the State.California ex rel. State Lands Commission v. United States, 457 U.S. 273(1982) and Corvallis, supra. State law will therefore control the question of whether the State of Arkansas has been divested of title to the property in question. Id.
Arkansas law on the subject is derived from both statutes and the common law. The most relevant Arkansas statute is A.C.A. § 22-5-404 (Repl. 1996), which is the codification of two Acts of Arkansas, Acts1945, No. 203 and Acts 1953, No. 126. The statute currently provides as follows:
 (a) The title to all lands which have formed or may form in the beds of nonnavigable lakes, or in abandoned river channels or beds, whether or not still navigable, which reformed lands or alluvia are above the ordinary high-water mark, shall vest in the riparian owners to the lands and shall be assessed and taxed as other lands.
 (b) The lands referred to in subsection (a) of this section shall include those lands which have emerged or which may emerge by accretion, reliction, evaporation, drainage, or otherwise from the beds of lakes or from former navigable streams, whether by natural or artificial causes, or whether or not the lakes were originally formed from the channel or course of navigable or nonnavigable streams.
The original Act 203 of 1945 applied only to lands emerging from nonnavigable lakes. The 1953 act expanded the section to include the language about abandoned river channels. In fact, the preamble toAct 126 of 1953 recites the following:
 WHEREAS many cut-offs have been made in the Mississippi river, and other rivers in the State of Arkansas, both naturally and artificially for the purpose of controlling the current of the river and the bank stabilization, and many old former river beds have remained as the result of such cut-offs and have gradually built up and reached the high-water mark as defined by the Supreme Court of Arkansas in the case of St. Louis, Iron Mountain Southern Railway Co. v. Ramsey, 53 Ark. 314, 13 S.W. 931, and permanent timber vegetation has grown on all or part of said old abandoned river beds, and
 WHEREAS it is intended hereby to clarify the intent of Act 203 of the General Assembly approved March 8, 1945, and to eliminate any question as to the intent thereof;
 THEREFORE, Sections 1 and 2 of Act 203 of the 1945 General Assembly are hereby respectively amended to read as follows. . . .
It has been stated that Act 126 of 1953 "was designed to furnish a means whereby the State could acknowledge that a river bed has been abandoned."Gill v. Porter, 248 Ark. 140, 450 S.W.2d 306 (1970).
The 1953 act left unamended sections 3 and 4 of the original 1945 act, which authorize the State Land Commissioner to execute deeds to the lands described in the statute to adjacent riparian landowners assuming certain listed conditions are met. See current A.C.A. § 22-5-405 (Repl. 1996). A survey of the lands in question is required. A.C.A. § 22-5-405(a) and (b). The land at issue must have emerged to the "mean high-water mark of any such stream or lake." A.C.A. § 22-5-405 (a). Affidavits must be filed to this effect and must state that the lands are "capable of cultivation." See A.C.A. § 22-5-405(d).
Although there is no case precisely on point, it appears that the statute applies notwithstanding the fact that the land emerged from an artificial cause, or from what might be termed in the common law an "avulsive," rather than an "accretive" event. The statute, at least as regards thestate's title, appears to change what is the generally accepted common-law rule that land exposed by an avulsion will not operate to change ownership or the boundary of a given tract, while land formed by an accretion will. See e.g. 65 C.J.S. Navigable Waters, §§ 82 and 86 (b).See also, Horne v. Howe Lumber Co., 209 Ark. 202, 190 S.W.2d 7 (1945), and Garrett v. State, 118 N.J. Super. 594, 289 A.2d 542 (1972). The statute includes lands which have emerged from natural or artificial
causes, by "accretion, reliction, evaporation, drainage, or otherwise.
. . ." A.C.A. § 22-5-405 (b) (emphasis added). The statute, as it relates to the rights of private riparian owners as against each other, appears to have been applied in conjunction with the common law doctrines of accretion and avulsion to determine the appropriate boundary.[3] Seee.g., Porter v. Arkansas Western Gas Co., 252 Ark. 958, 482 S.W.2d 598
(1972) and Gill v. Porter, 248 Ark. 140, 450 S.W.2d 306 (1970). Seealso, United States v. Keenan, 753 F.2d 681 (8th Cir. 1985).
Clearly, this statute was intended to allow the state to divest itself of title to lands emerged from a river bed after the construction of a "cut-off." The statute only applies, however, to "lands" which have emerged to the high water mark. It does not appear to apply to lands still under water. The letter enclosed with your request indicates that "[p]ortions of the former bed of the river are now dry land; other portions remain underwater."
As regards lands still underwater, or below the ordinary high water mark, common law principles must be applied. It is held in Arkansas, in contrast to the majority of states, that because the state's title to the land under water rests on navigability, when the navigation ceases the title terminates, and riparian rights attach. See Parker, Commissioner ofRevenue v. Moore, 222 Ark. 811, 262 S.W.2d 891 (1953), relying onHarrison v. Fite, 148 F. 781 (8th Cir. 1906). See also United Statesv. Keenan, supra; Gill v. Porter, supra; Porter v. Arkansas Western GasCo., supra, and Five Lakes Outing Club v. Horseshoe Lake ProtectiveAssociation, 226 Ark. 136, 288 S.W.2d 942 (1956). Compare 65 C.J.S.Navigable Waters, § 97. A determination, therefore, of the title to the lands still under water will require a finding as to the water's navigability. This is an inherently factual question. If no longer "navigable," Arkansas common law provides that riparian ownership attaches at the time the waters became nonnavigable. See Keenan, supra,and Gill v. Porter, supra.
While I cannot provide a definitive resolution of the question posed, I hope the foregoing recitation of the law is helpful in your approach to this issue.
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh
[1] It appears that it is the land underlying the "Trustee Bend," and not the "Trustee Bend Cutoff," which is at issue.
[2] This Committee is created at A.C.A. § 22-5-804, and is composed of the Director of DFA or his designee, the Director of the Oil and Gas Commission, The State Geologist, the State Forester, the Director of the Arkansas Soil and Water Conservation Commission, the Commissioner of State Lands, the Director of the State Game and Fish Commission, the Director of the Department of Parks and Tourism or his designee, the Director of the Arkansas Department of Pollution Control and Ecology, and the Director of the Natural Heritage Commission. The only statutory powers granted the Committee appear to be the establishment of a schedule of minimum fees and royalties, as well as the terms and conditions for various types of permits and leases, and the changing of such schedule and terms. See A.C.A. § 22-5-804 (c) and (d). It appears that you, as Commissioner of State Lands, have the authority to actually grant leases and permits for the taking of oil and gas from the beds of navigable waters and other state lands. See A.C.A. § 22-5-801.
[3] It appears, additionally, that the doctrines of accretion and avulsion are still relevant for determining any county boundary issues arising from the subject property. See e.g. Adkisson v. Starr,222 Ark. 331, 260 S.W.2d 956 (1953); Deloney v. State, 88 Ark. 311,115 S.W. 138 (1908); and Matthews v. McGee,358 F.2d 516 (8th Cir. 1966). The correspondence enclosed with your request indicates that the subject property is located in "Crawford and Sebastian Counties." The Arkansas River is the boundary between those counties. See Fulton Ferry BridgeCo. v. Blackwood, 173 Ark. 645, 293 S.W. 2 (1927).