338 So.2d 13 (1976)
STATE of Florida and Board of Trustees of the Internal Improvement Trust Fund, Appellants,
v.
FLORIDA NATIONAL PROPERTIES, INC., Etc., Appellee.
No. 45787.
Supreme Court of Florida.
July 14, 1976.
Rehearing Denied October 14, 1976.
*14 Robert L. Shevin, Atty. Gen., Thomas A. Harris, Asst. Atty. Gen., and Kenneth G. Oertel, Tallahassee, for appellants.
Kenneth L. Connor and Robin Gibson of Gibson & Connor, Lake Walers, for appellee.
BOYD, Justice.
This cause is before us on appeal from the Circuit Court, Highlands County. The trial court in its final judgment passed upon the constitutionality of Section 253.151, Florida Statutes, giving this Court jurisdiction of the direct appeal.[1]
Section 253.151, Florida Statutes, reads as follows.
"253.151 Navigable meandered fresh water lakes

"(1) The submerged lands located under navigable meandered fresh water lakes shall be considered as a separate class of sovereignty lands. Such separate class of sovereignty lands shall not be construed to be of the same character as tidal lands, streams, watercourses, or rivers or as lakes attached to tidal waters by means of navigable watercourses, but, rather, shall be administered in accordance with the provisions of this section.
"(2) For the purposes of this section:
"(a) `Board' means the board of trustees of the internal improvement trust fund.
"(b) `Boundary line' means the line which separates the sovereignty lands of the state from those of a riparian upland owner. Such boundary line shall be described in terms of elevation above mean sea level of the state as indicated on the bench mark of the United States Coast and Geodetic Survey nearest the respective navigable meandered fresh water lake.
"(c) `Elevation' means the distance above mean sea level as established by official United States Coast and Geodetic Survey bench marks.
"(d) `Usufructuary right' means the temporary right of using the land lakeward of the boundary line to the existing waterline. The term shall not be construed to convey to any riparian owner the right to erect permanent structures of any type upon sovereignty lands without the express consent of the board.
"(e) `Commercial operation' means the operation of any facility located on submerged land in navigable meandered fresh water lakes for the purpose of earning a profit from such operations.
"(3) The boundary line shall be established by, or under the supervision of, the board by use of one or more of the following procedures:
"(a) Where physical evidence exists indicating the actual water's edge of any navigable meandered fresh water lake as of the date such body came under the jurisdiction of the state, regardless of where the water's edge exists on the date of the determination of the boundary line, the water's edge as evidenced on the former date shall be deemed the boundary line.
"(b) Where sufficient physical evidence cannot be found, or in conjunction with such physical evidence as may exist, affidavits of local, longtime residents attesting to the average levels of such lakes shall be used. Such affidavits shall not be used unless they can be dated back to a period of time at least twenty-five years prior to July 1, 1970.
"(c) Where gauging stations have been installed and continuous data at lake water elevations have been obtained therefrom for a period of no less than ten consecutive years, such data may be used for ascertaining the boundary line at such lake.
"(d) Actual on-site examination of the terrain (landward and lakeward of the existing waterline) and of plant life, including upland and aquatic, by qualified personnel and the other physical indications *15 of present and past waterlines which shall be deemed reasonable may be used in determining the boundary line. This investigation may include public hearings, as well as examination of existing docks, structures, and other physical evidence which may properly be construed as germane to the location of the boundary line.
"(4) A boundary line shall become effective only after a description of its location has been approved by the formal action of the board and this description has been published in a newspaper of general distribution in the county where located at least once a week for three consecutive weeks. The boundary line elevation shall then be placed in the public records of the county or counties in which the navigable meandered fresh water lake is situated. A suitable monument shall be placed in or on such lake as a permanent point of reference so that all interested persons may be able to determine the physical boundary line by proper survey and projection onto the shoreline.
"(5) The riparian owner shall have the usufructuary right over lands lakeward of the boundary line down to the existing waterline, but such riparian owner shall not deny the use of the water above the established boundary line to any other owner or to the general public so long as such public does not come onto the land above the existing waterline. A riparian owner shall have the right of ingress and egress to and from the water for purposes of boating, swimming, fishing, skiing, and similar activities and shall:
"(a) Be granted the privilege of clearing the aquatic vegetation, except woody plants of a diameter greater than two inches, measured at the base, out in the water to the extent necessary to enable him to use the public waters reasonably for boating, swimming, skiing, fishing, and similar activities. If an area greater than one fifth of an acre is to be cleared within a period of three months, a permit must be applied for and granted by the board.
"(b) Be permitted to fill to combat erosion. However, in no case shall this section be construed to grant a riparian owner the right to add on land out into the main body of the water in such a manner as to constitute an encroachment upon the sovereignty submerged bottoms to gain more property or to restrict others from reasonable use of the water. A permit from the board shall be necessary for such fill projects to combat erosion.
"(c) Be granted usufructuary right in any strip of land which may be exposed due to natural recession of the waters, between the boundary line and the existing waterline.
"(6) Any authorized dock, boathouse, or other structure, erected under permit, shall be for the sole use and control of the riparian owner.
"(7) Nothing contained in this section or § 253.12(1) shall be construed as affecting privately owned lakes, streams, watercourses, or submerged lands.
"(8) The board shall promulgate such rules and regulations as may be necessary to carry out the purposes of this section."
The facts of this case are as follows.
Appellee-Plaintiff is a riparian owner of certain lands in Highlands County bordering Lake Istokpoga, a navigable lake. The ordinary high-water mark of Lake Istokpoga was meandered at different points and different times by U.S. Government surveyors in the late 1800's and early 1900's. Lake Istokpoga was meandered in the area of Appellee's property in 1928. Appellee deraigns its title back to certain warranty deeds issued by Appellant-Trustees of the Internal Improvement Trust Fund, the Trustees having previously received the lands by a swamp and overflow lands grant from the U.S. Government. The land was acquired by Appellee for the purposes of development and of resale as a residential community on the shores of Lake Istokpoga; *16 because of this, a need to do some work in the navigable waters of Lake Istokpoga arose. Approximately four years prior to the filing of this action, a dispute arose between the Trustees and Appellee as to the location of the boundary lines between the sovereignty bottom lands of the Lake and Appellee's upland property. Efforts to resolve the dispute were fruitless; the Trustees maintained that, pursuant to Section 253.151, Florida Statutes, the boundary line should be located at a contour 41.6 feet above mean sea level, a boundary unacceptable to Appellee since this proposal laid claim to approximately half of Appellee's purchased property (generally, throughout the trial Appellee claimed that the ordinary high-water line was at an elevation of approximately 38.5 feet above mean sea level).
Throughout the proceedings the Trustees maintained that the ordinary level of the Lake was permanently and artificially lowered during the 1920's as the result of certain drainage operations conducted by property owners surrounding the Lake; it was the Trustees' position that the unauthorized drainage of the Lake by the riparian owners could not be considered to have decreased the State's ownership and that the ordinary high-water line as it existed in 1926 would remain the legal boundary between State and private ownership. The evidence showed that some of the riparian owners had exercised self-help by dynamiting obstacles from a drainage canal to return the Lake to an ordinary level and to expel flood waters from farm lands following the historic 1926 hurricane. Therefore, Appellee's position was that any lowering of the Lake was legally reliction and that the present ordinary high-water line, regardless of the historical contour of the Lake, is the appropriate boundary between private and State-owned land. The testimony clearly shows that the survey notes, made after the mean level of the Lake was lowered, reflect that this lowering resulted in the exposure of only marshland, not of lake bottom. Furthermore, the surveyor's notes continue to say that the Lake is contained in a well-defined basin with an almost continuous shore rim which is timbered with good timber, mostly shore variety, giving positive proof of the location of the lakeshore before the drainage operations were put into effect. There was additional testimony that this timbered shore rim, which ranged from 3 to 10 chains wide between the lakeshore and Istokpoga marsh in Section 13, and from 2 to 5 chains wide in Section 12, is essentially the same today as at the time of the survey in 1928. The survey notes also indicate that the draining by the landowners approximately equaled the amount the Lake had been raised by the hurricane, thereby balancing out.
Following a two-day trial the lower court ruled that the boundary line betwen Appellee's upland property and the sovereignty bottom lands was the present ordinary high-water mark of Lake Istokpoga. The trial judge specifically found that in the disputed area the 1928 Government meander line was at all points coordinate with or upland of the present ordinary high-water mark of Lake Istokpoga; consequently, the court set aside Appellants' claim to all property upland of the 1928 meander line in the area of Appellee's property. The court also found that Appellants' claim to the 41.6 feet contour had been based on Section 253.151, Florida Statutes, and adjudged the statute to be unconstitutional both on its face and as applied by Appellants, as follows:
"The Court ... finds that the [Appellants'] claim to the 41.6 contour is based on Fla. Stat. § 253.151. The record is replete with evidence which clearly shows that the Trustees have repeatedly asserted this Statute as their authority for the State's claim to the 41.6 contour line. Although during the course of this proceeding the Trustees have retreated from the Statute as the basis for the State's claim, this change in approach is not convincing. Other than § 253.151, the Court can find no authority whatsoever for fixing the boundary line at a *17 particular elevation as urged by the Trustees.
"A provision in the State of Washington's Constitution similar to § 253.151 which purported to fix the boundary line between sovereignty lands and private ownership as of the date Washington was admitted to the Union was struck down by the Supreme Court in Hughes v. Washington, [389 U.S. 290, 19 L.Ed.2d 530, 88 S.Ct. 438 (1967)] as a violation of Art. VI, Sec. 2, the Supremacy Clause, of the United States Constitution. It is apparent from Bonelli [Bonelli Cattle Co. v. Arizona] [414 U.S. 313, 38 L.Ed.2d 526, 94 S.Ct. 517 (1973)] and Hughes that Federal, not State, law governs the resolution of boundary line disputes between the sovereign and private owners whose lands border navigable bodies of water. In Hughes the Supreme Court stated:
`A long and unbroken line of decisions of this Court establishes that the grantee of land bounded by a body of navigable water acquires a right to any natural and gradual accretion formed along the shore. [389 U.S. at 292, 88 S.Ct. at 439,] 19 L.Ed.2d at 533.'
This principle was extended in Bonelli to include artificial accretions where the accreted land served no navigational purpose. Rejecting the same approach taken by the Defendants in this case, the U.S. Supreme Court stated in Hughes:
`Any other rule would leave riparian owners continually in danger of losing the access to water which is often the most valuable feature of their property, and continually vulnerable to harassing litigation challenging the location of the original water lines. [389 U.S. at 293, 88 S.Ct. at 440,] 19 L.Ed.2d at 534.'
Fla. Stat. § 253.151 which purports to fix the public/private boundary line as of the date of Statehood, suffers from the same infirmities as the constitutional provision under consideration in Hughes; and it is likewise unconstitutional.
"Furthermore, Fla. Stat. § 253.151, as applied by the Trustees in the instant case, violates the due process clauses of both the Federal and Florida Constitutions. By relying upon § 253.151, the State, through the Trustees, claims not only the lands to which Plaintiff has already gained title through the operation of accretion and reliction, but also seeks to deny to Plaintiff the right to acquire additional property in the future through the process of accretion and reliction. Both Federal and Florida courts have held that an owner of land bounded by the ordinary high water mark of navigable water is vested with certain riparian rights, including the right to title to such additional abutting soil or land which may be gradually formed or uncovered by the processes of accretion or reliction, which right cannot be taken by the State without payment of just compensation. Bonelli, supra, [414 U.S. at 329-331, 94 S.Ct. at 527-528,] at 541-542; St. Clair County v. [Lovingston] Livingston, 90 U.S. (23 Wall.) 46, 23 L.Ed. 59; Padgett v. Central and Southern Florida Flood Control District, 178 So.2d 900 (Fla. 2d DCA 1965); Thiesen v. Gulf F&A Ry. Co., [75 Fla. 28,] 78 So. 491 (Fla. 1918). By requiring the establishment of a fixed boundary line between sovereignty bottom lands and Plaintiff's riparian lands, Fla. Stat. § 253.151 as applied by the Trustees in the instant case, constitutes a taking of Plaintiff's property, including its riparian rights to future alluvion or accretion, without compensation in violation to the due process clause of the Fourteenth Amendment of the United States Constitution and the due process clause of Art. I, Sec. 9, of the Florida Constitution.
"The Court also finds that Fla. Stat. § 253.151 is unconstitutional in its entirety. Subsection (3), which requires the Defendant Board of Trustees to establish the boundary line between the sovereignty bottom lands of navigable meandered fresh water lakes and riparian uplands, cannot be separated from the remaining *18 portions of the Statute, which are closely connected with and refer to the boundary line established pursuant to subsection (3). Without subsection (3), the other provisions of the Statute are meaningless since they serve no purpose independent of the establishment of the boundary line. Hence, the Statute, which contains no severability clause, is invalid in its entirety."
It is from this final judgment that this appeal is taken.
Historically, the Crown or the government has owned for the benefit of the public the areas covered by navigable bodies of water so that the government could protect the pubic's right of navigation and preserve commerce;[2] the upland owners have owned the dry lands down to the high-water mark. In the instant case, the Trustees retreated from their reliance on Section 253.151, Florida Statutes, relying instead on Article X, Section 11, Florida Constitution, for their claim of ownership of the lands in question:
"§ 11. Sovereignty lands. The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands may be authorized by law, but only when in the public interest. Private use of portions of such lands may be authorized by law, but only when not contrary to the public interest."
Appellant-State asserts that not all of Section 253.151, Florida Statutes, should be held unconstitutional as certain provisions prohibit encroachments by upland owners upon sovereignty lands and require State permits for modification of the boundary lines in elevating or lowering the submerged sovereignty lands. In our view, right of control over sovereignty lands is so inherent in the State that we feel such control can be exercised with or without specific statutory provisions.
Upon careful consideration of both the record and arguments of counsel, we conclude that the trial court correctly held the efforts of the State to fix specific and permanent boundaries were improper, and we hold that Section 253.151, Florida Statutes, is unconstitutional. We agree that subsection (3), which fixes the boundary line between sovereignty lands and riparian uplands, cannot be separated from the remaining portions of the statute, and with the exception of subsection (2), which consists entirely of definitions, all other sections are closely connected with and refer to the boundary line between sovereignty lands and riparian uplands as fixed by subsection (3). Therefore, we also agree with the lower court's conclusion that the statute, which contains no severability clause, is invalid in its entirety.
Additionally, the ancient common law relating to accretion and reliction prevails in Florida. However, we recognize that the doctrine of reliction is applicable in situations where water recedes by imperceptible degrees from natural causes and that it does not apply where land is reclaimed by deliberate drainage.[3] This is not the situation in the instant case. Here, the evidence clearly shows that the 1926 self-help by the riparian owners did not affect a lowering of the water level below the normal high-water mark; instead, as the survey notes show, the action merely returned the water to its normal level and did not expose any lake bottom. Therefore, while the Appellee is entitled to the land down to the present ordinary high-water line, as held by the lower court, it is not because of the doctrine of reliction but because of the location of the actual, present high-water mark. This is not to say that, where an unlawful change in the high-water mark has been precipitated, the land uncovered by the lowering would belong *19 to the upland owner; to the contrary, such bottomland would continue to be owned by the State.[4] Acquiescence or failure by the State to restrain an artificial lowering of the water table for a long period might constitute laches or estoppel depending upon facts and equities in each case.
It is our opinion, and we so hold, that the property line separating sovereignty and riparian property rights is the ordinary high-water mark in meandered fresh water lakes. In doing so we recognize that such line is subject to change from natural causes or with joint consent of the State and private riparian owners. Furthermore, as stated above, we sustain the learned trial court in holding Section 253.151, Florida Statutes, unconstitutional in its entirety. An inflexible meander demarcation line would not comply with the spirit or letter of our Federal or State Constitutions nor meet present requirements of society.
Accordingly, the judgment of the trial court is affirmed.
It is so ordered.
ROBERTS and ADKINS, JJ., and KLEIN, Circuit Court Judge, concur.
ENGLAND, J., concurs in part and dissents in part with an opinion, with which OVERTON, C.J., concurs.
HATCHETT, J., concurs in part and dissents in part with an opinion.
ENGLAND, Justice (concurring in part and dissenting in part).
I concur in the Court's affirmance of the trial court on the issues litigated in this case, but I dissent from the Court's declaration that all of Section 253.151 is unconstitutional.
The lawsuit filed by Florida National Properties, Inc. sought a declaration of the boundary to certain of its property. After the trial judge had set that boundary he declared Section 253.151 unconstitutional in its entirety. On review here, the State concedes the invalidity of the boundary-setting provisions contained in subsection 253.151 (3). The State argues, and I believe rightly, that it was unnecessary and improper for the judge to invalidate other portions of Section 253.151 which had no relevance to this boundary dispute.
Only subsections 253.151(3) and (4) of the statute involve the setting of boundaries between private and sovereign lands. Other provisions of the statute regulate private activities in connection with sovereign lands. This lawsuit presents no occasion to invalidate this regulatory scheme. The fact that Section 253.151 contains no severability clause which would allow the invalidation of any particular subsection is no impediment to the more limited action I would approve. Cramp v. Board of Public Instruction, 137 So.2d 828 (Fla. 1962); State v. Calhoun County, 127 Fla. 304, 170 So. 883 (1936).
OVERTON, C.J., concurs.
HATCHETT, Justice (concurring in part and dissenting in part).
I concur in the view that riparian landowners take title to new lands created by natural accretion and reliction, and I see no reason why riparian landowners should be divested of title to land, which has been submerged by hurricane or other catastrophe, when they take measures necessary to restore their property to its ordinary state. In my opinion, this case requires decision of no other question, and certainly does not require striking down a statute. Accordingly, I respectfully dissent from the Court's decision as to the validity of Fla. Stat. § 253.151 (1973).
Appellee Florida National Properties, Inc. (Florida National), filed a complaint in the trial court, alleging a dispute between appellants and appellee over ownership of land, and asking for declaratory and injunctive relief. This is the kind of question which courts have traditionally been called upon to answer in ejectment *20 and quiet title actions, but declaratory judgment is also an appropriate means for resolution of such a controversy. State Board of Trustees of Internal Improvement Trust Fund v. Pineta Co., 287 So.2d 126 (Fla.3d App.Dist. 1973); Bozeman v. Roberts, 188 So.2d 23 (Fla.1st App.Dist. 1966). Contra, Stark v. Marshall, 67 So.2d 235 (Fla. 1953) (alternative basis for decision). The form of action cannot, however, alter the "established maxim of statutory construction that courts have the judicial obligation to sustain legislative enactments when possible." North Port Bank v. State Dep't of Revenue, 313 So.2d 683, 687 (Fla. 1975); State v. Aiuppa, 298 So.2d 391 (Fla. 1974); McKibben v. Mallory, 293 So.2d 48 (Fla. 1974); Burnsed v. Seaboard Coast Line R. Co., 290 So.2d 13 (Fla. 1974); State v. Mayhew, 288 So.2d 243 (Fla. 1973). "It is elementary that ... if fairly possible a statute should be construed to avoid . . an unconstitutional interpretation," State ex rel. Shevin v. Metz Construction Co., Inc., 285 So.2d 598, 600 (Fla. 1973), if it is necessary to reach the constitutional question at all. In my view, there is no need to pass on the validity of any portion of Fla. Stat. § 253.151 (1973), in deciding the parties' rights to the property in contention.
In paragraph four of its complaint, Florida National alleged:
Following the Plaintiff's purchase of the property, the STATE, through the TRUSTEES and by virtue of Florida Statute 253.151, made claim to all of the Plaintiff's land lakeward of a contour 41.6 feet above mean sea level contending this land to be sovereignty bottom lands. A copy of the letter making the claim is attached as Exhibit C.[1]
Both general counsel for the Board of Trustees, on its behalf, and the attorney general, on behalf of the State, filed answers to the complaint. The attorney general answered paragraph four to the effect that he was without knowledge as to the truth of the averment, and subsequently took the unequivocal position that Fla. Stat. § 253.151 (1973) ought not apply. The Board of Trustees answered paragraph four, as follows:
The Board of Trustees denies that this claim [that the disputed land belongs to the state] is based on Chapter 253.151 of the Florida Statutes, and state[s] that this claim is based on Florida's sovereign ownership of lands beneath navigable waters in Article X, Section 11 of the Florida Constitution.[2]
In short, the pleadings reflect that both sides agreed that Fla. Stat. § 253.151 (1973) ought not control on the question the complaint raised. Appellee alleged that the appellants' reliance on the statute was misplaced and unjustified, and the appellants answered that their reliance on the statute was nonexistent.
In paragraph six of the complaint, Florida National simply "contend[ed] that Florida Statute 253.151 is unconstitutional ..." The attorney general and the Board of Trustees answered paragraph six with "deny" and "denied", respectively. *21 This exchange added nothing. The mere allegation that a statute is unconstitutional cannot suffice to put the statute's constitutionality in issue, even though opposing parties deny the allegation. Otherwise, it would lie in the parties' power to require a court to decide a statute's constitutionality, although such an adjudication was unnecessary to decision of the cause. The contrary rule is well-settled in Florida, as elsewhere, even if it is not followed today. For reasons it does not articulate, the Court chooses not to "adhere to the settled principle of constitutional law that courts should not pass upon the constitutionality of statutes if the case in which the question arises may be effectively disposed of on other grounds." Singletary v. State, 322 So.2d 551, 552 (Fla. 1975); Peoples v. State, 287 So.2d 63 (Fla. 1973); Williston Highlands Development Corp. v. Hogue, 277 So.2d 260 (Fla. 1973); Walsingham v. State, 250 So.2d 857 (Fla. 1971); Overstreet v. Blum, 227 So.2d 197, 199 (Fla. 1969).
The pretrial order dated March 26, 1974,[3] reflects the trial judge's initial doubt whether it was necessary to decide the constitutionality of Section 253.151. The final judgment recites that evidence showed the appellants had previously relied on "this Statute as their authority for the State's claim" and concluded that the appellants' conceded "retreat" from this position "is not convincing." But the position a litigant takes in a lawsuit is not a question of fact to be decided on the basis of evidence. A litigant may abandon any defense he elects to abandon, and the defendant in a civil suit may waive any right he chooses, generally simply by never asserting it. Cf. Barth v. Florida State Contractors Service, Inc., 327 So.2d 13 (Fla. 1976). The court's decision today stands for the unlikely proposition that a party claiming, in the course of out of court negotiations, that a statute lends support to his position has thereby necessitated an adjudication as to the statute's constitutionality, when the other side files suit. I disagree.
Rehearing denied.
OVERTON, C.J., and ROBERTS, ADKINS, BOYD, and ENGLAND, JJ., and KLEIN, Circuit Court Judge, concur.
HATCHETT, J., dissents.
NOTES
[1] Article V, Section 3(b)(1), Florida Constitution.
[2] Bonelli Cattle Co. v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); Martin v. Busch, 93 Fla. 535, 112 So. 274 (1927).
[3] Martin v. Busch, Id. at 287.
[4] Id.
[1] Exhibit C reads, in pertinent part, as follows:

Dear Mr. Ward:
Florida National Properties, Inc. Lake Istokpoga Highlands County
The staff has reviewed the exhibits you furnished as well as other pertinent data relative to the original ordinary high water line of Lake Istokpoga. Based on this information, we believe the elevation of the original ordinary high water line of this lake to be 41.6 feet above mean sea level.
 Sincerely,
 Joel Kuperberg
 Executive Director

[2] land. The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people... .
[3] In this order, the trial court delineated the "issues to be tried," as follows:

1. Location of the boundary line between the sovereignty bottom lands of Lake Istokpoga and Plaintiff's upland property.
2. Whether or not Lake Istokpoga has been artificially drained; and if so, the effect, if any, of such drainage on the property rights of the parties.
3. Whether or not the State of Florida, through the Board of Trustees of the Internal Improvement Trust Fund, bases its claim to the disputed property on Florida Statute 253.151.
4. If applicable, the Constitutionality of Florida Statute 253.151 on its face and as applied in the instant case.