**MARTIN ANDERSON, Appellant**

**v.**

**VAIVAO M. FRUEAN, FUGA T. TELESO and TAITO AFA, Appellees**

**MARTIN ANDERSON, Appellant**

**v.**

**AMERICAN SAMOA GOVERNMENT, Appellee**

High Court of American Samoa
Appellate Division

AP No. 9-90

June 15, 1992

---

knowledge may lend itself to an inference that proper notice was given.

Before RICHMOND, Associate Justice, GOODWIN,[*] Acting Associate Justice, MUNSON,[**] Acting Associate Justice, MAILO, Associate Judge, and BETHAM, Associate Judge.

Counsel: For Appellant, William H. Reardon
          For Appellees Vaivao, Fuga, and Taito, Tauese P. Sunia
          For Appellee American Samoa Government,
          Arthur Ripley, Jr., Assistant Attorney General

RICHMOND, J.:

This appeal is from the decision in two consolidated cases of the Land and Titles Division holding that the appellant, Martin Anderson (Anderson), did not own either of the two claimed portions of the parcel "Logopesega."[1]

The two cases concern the single, freehold parcel of land called "Logopesega" in Pago Pago, American Samoa. This parcel was purchased by Jane Sophia Foster and was later confirmed to be her land in Court Grant 852 in 1897. Douglas O. Craddick (Craddick) purchased Logopesega from the heirs of Jane Foster in 1981 and later assigned his interest to Anderson. The main road around Pago Pago

---

[*]   Honorable Alfred T. Goodwin, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of the Interior.

[**]  Honorable Alex R. Munson, Chief Judge, United States District Court for the Northern Mariana Islands, serving by designation of the Secretary of the Interior.

[1]  Also spelled "Lotopesega."

Harbor divides Logopesega approximately along the claims of the parties.

The first case, LT Nȯ. 40-85, was originally brought by the matais of the communal families Vaivao, Fuga, and Taito (the communal families), which claimed an interest in the land on the mountain or mauga side of the road, against Craddick to quiet title to the mauga side of Court Grant 852 and for unspecified damages. Anderson intervened in this action as Craddick's assignee or his successor in interest. The lower court ruled that the communal families did indeed own the land, which they acquired through adverse possession. The court did not decide which families owned which portions of the parcel, so it therefore could not quiet title, and it did not award damages because no evidence on these issues was offered at trial. Anderson now appeals, claiming that the court erred in not finding that he, as the owner of Court Grant 852, owns this land. The matais did not appeal the decision and, in fact, filed no appellate brief.

The second case, LT No. 2-87, was brought by Anderson against the American Samoa Government (ASG) to quiet title to the seaward or sami side of the road. ASG has quitclaimed part of this section of the parcel to Anderson.[2] At issue is the remaining part of the sami side of Logopesega, which was entirely created when the government filled in the back portion of Pago Pago Harbor for park and recreation purposes; this filling project began in 1966.[3]

*Standard of Review*

Anderson claims that, because this is an action in equity, we should review the trial court's findings of fact *de novo*. To do so, however, would be directly contrary to the mandate of A.S.C.A. § 43.0801(b), which states that "[t]he findings of fact of the trial, probate *and land and titles divisions* of the High Court may not be set aside by the appellate division unless clearly erroneous" (emphasis

---

[2] This quitclaimed portion was part of yet another case, *Craddick v. ASG*, LT No. 20-85, which has been resolved and is not at issue in this appeal. The Pago Plaza has since been erected on this portion of the parcel.

[3] Most of the disputed portion of land now serves as the parking lot for the Pago Plaza.

added).  We therefore apply the clearly erroneous standard to questions of fact.  Questions of law are, of course, reviewed *de novo* by the appellate division.

### The Mauga Side

Although Anderson phrases his appeal of the decision awarding the mauga side to the communal families as three issues, essentially there is only one issue:  was the evidence sufficient to support the trial court's decision?  The question on appeal here is one of fact.  The evidence and testimony submitted to the trial court was, as the court acknowledged, inconsistent.  The relevant test is not whether there were facts in the record sufficient to support a decision for the appellant, but whether there was sufficient evidence to support the trial court's decision--only then would the decision be clearly erroneous.

The trial court is in the unique position of being able to assess the credibility of witnesses, both interested and disinterested.  The court carefully considered the testimony of the witnesses before it found that the communal families had adversely possessed the land. Moreover, the trial court in this case went so far as to inspect the parcel at issue, to enhance its ability to assess the credibility of both the surveys submitted and the witnesses' versions of the use and occupancy of the parcel.  We cannot say that the evidence cited by the trial court is insufficient to support its decision.

Anderson also argues that the land could not be adversely possessed through an "unorganized use of the premises by the general public which indicates a claim of common or public right." *Appellant's Brief* at 8.  The trial court did not find such a use by the general public, however.  It found that the *plaintiff communal families*, not the general public, "have had possession of the disputed area for a great number of years while exercising proprietary rights thereon . . . without any interruption whatsoever from the Fosters."  Additionally, after reciting the requirements of adverse possession, the court concluded that "*[p]laintiffs'* possession of the disputed land area certainly qualifies to confer title on them."  (Emphasis added).

Because land can be owned communally in American Samoa, it logically can also be adversely possessed communally.  *See Fau v. Wilson*, 4 A.S.R. 443, 448 (1964); *Laeli v. Moetoto*, 4 A.S.R. 494, 495 (1964).  Such possession is distinct from use by the general

public. It includes exclusive and continuous possession by the communal family against the rest of the world.

Anderson misconstrues A.S.C.A. § 37.0201,[4] which defines freehold land, in an attempt to show that adverse possession of freehold land violates public policy. Such a construction, however, would mean that freehold land could never be adversely possessed. No such exception is evident in the adverse possession statute, A.S.C.A. § 37.0120. Freehold land is essentially the only fee-simple title to land available in the territory. Anderson has shown no public policy reason to exempt such titles from the adverse-possession statute.

The court found that the communal possession was clearly shown, although the plaintiffs did not submit a survey or comply with other necessary requirements sufficient to register the land or to award the requested relief. These findings were not clearly erroneous and the conclusions of law were correct. We therefore affirm the trial court's decision awarding the land to the communal families.

*The Sami Side*

Anderson's arguments concerning the sami side of Logopesega are more complex. Craddick, Anderson's assignor, originally laid claim to the filled land as the owner of the littoral rights of Court Grant 852 and who is therefore entitled to the abutting, reclaimed land. ASG claims to have acquired title to the littoral rights in 1900 through two enactments on September 3, 1900: Ordinance No. 15, called "An Ordinance Relating to a Public Highway in Pago Pago," and Regulation No. 16, called "Regulation Concerning the Public Road of Pago Pago as Defined in Ordinance No. 15 of the United States Naval Station, Tutuila" (collectively, the ordinances).[5]

---

[4] A.S.C.A. § 37.0201(b) states:

> "Freehold lands" means all those lands included in court grants prior to 1900 which have not, at the request of the owner, been returned to the status of other land in American Samoa surrendering their freehold characteristics.

[5] The Ordinances were later codified by the Legislative Branch of the Government of American Samoa. Ordinance No. 15 now appears as

Ordinance No. 15 condemned the land from Blunt's Point to Breaker's Point "along the shore at high-water mark, of a uniform 15 feet distant inland from said shore." It also provided that anyone claiming compensation for this condemnation "must present their claims to the High Court within three months from the date hereot [sic]; otherwise such claims shall not be recognized." Regulation 16 then declared it unlawful for anyone to erect any building or structure on the sami side of the public highway without permission of the Commandant of the United States Naval Station, Tutuila, thus asserting the government's proprietary authority over its newly-acquired land. Court Grant 852 extended to the high-water mark within the above area, and ASG claims that the United States therefore acquired the littoral rights of this parcel through the ordinances; these rights were later transferred to ASG.[6]

---

A.S.C.A. § 37.2050:

> The public highway declared and proclaimed by Regulations No. 15 and No. 16, 1900, enacted 3 September 1900 by B.F. Tilley, U.S.N., Commandant, and amended by W. Evans, Captain, U.S.N., on 10 May 1921, extending from Blunt's Point on the southern side of Pago Pago Harbor, toward Observatory Point and around the harbor to Breaker's Point on the northern side of the harbor, along the shore at high water mark, of a uniform width of 15 feet distant inland from the shore, the land included in the description being condemned and appropriated for public uses, is recognized as a public highway, and the rights of the government and public thereto is asserted.

Regulation No. 16 now appears as A.S.C.A. § 37.2052 (now requiring the permission of the Governor rather than the Commandant).

[6] Act Aug. 17, 1961, Pub. L. 87-158, 75 Stat. 392, provides:

> The Secretary of the Navy is hereby authorized and directed to transfer, without reimbursement or transfer of funds, to the government of American Samoa, within ninety days after the date of enactment of this Act [enacted Aug. 17, 1961] title to all property, real and personal, which is located in American Samoa on

## 1. *Lago v. Mageo* and the Treaty of Cession

Appellant first claims that the trial court erroneously relied on *Lago v. Mageo*, 4 A.S.R. 287 (1962), *aff'd sub nom. Mageo v. American Samoa Gov't*, 4 A.S.R. 874 (1963), instead of overruling it; he now urges us to overrule it. This issue is raised too late.

Anderson claims that the court in *Lago* erred because it never addressed the issue of whether the ordinances that condemned the land and essentially set a statute of limitations for seeking compensation for this land complied with the Treaty of Cession of Tutuila and Aunuʻu (the Treaty), which governs the transfer of the islands of Tutuila and Aunuʻu to the United States. Appellant claims that the ordinances allowed the government to take property without paying for it, if the owner did not file for compensation within the allotted three months. According to Anderson, this violates the Treaty because Section 2 of the Treaty provides that

> if the [United States] Government shall require any land or any other thing for Government uses, the Government may take the same upon payment of a fair consideration for the land, or other thing, to those who may be deprived of their property on account of the desire of the Government.

Anderson did raise, in his *Memorandum of Martin Anderson* at 5 (filed Jan. 19, 1990), the issue of whether the ordinances violated

---

> the date of enactment of this Act [enacted Aug. 17, 1961] . . . and which is owned by the United States and is within the administrative supervision of the Department of the Navy on such date.

(Act may be found in 48 U.S.C.S. § 1662 note.)

This transfer was apparently accomplished by a deed entitled "Transfer of Navy Property to the Government of American Samoa," from E. J. Poltier, Chief of the Bureau of Yards and Docks, by direction of the Secretary of the Navy, and is probably dated on or about November 15, 1961, although we have been unable to locate a signed copy of this deed.

the Treaty through overbreadth.[7]  He did not, however, raise the larger issue until his motion for reconsideration.  It is therefore not appropriately before this Court.  *Vaimaona v. Tuitasi*, 13 A.S.R.2d 76, 82 (1989).

Nevertheless, contrary to appellant's urging that we overrule *Lago*, we would reaffirm the court's holding in *Lago* as within the parameters set out by the Treaty.  The ordinances, which became published law, were an effective and fair means for the government to acquire the land needed to establish the public highway in the Harbor area.  Compensation was offered, in accordance with the Treaty, although the records of payments made cannot be located.  As a practical matter, such an ordinance was surely the best way to condemn such a large section of land across the property of so many frequently unregistered and, therefore, unknown owners.

### 2. Overbreadth

Appellant next claims that the ordinances took more land than was strictly necessary for a road and thus were an overbroad taking.

The trial court incorrectly interpreted the language of the ordinance to mean that the government acquired a "uniform 15 feet of land in from the shoreline."  We instead agree with the *Lago* court's interpretation, which concluded that the language of Ordinance No. 15 meant that "the road was to be 'of a uniform width of fifteen feet' and it was to be 'distant inland from' the shore."  *Lago*, 4 A.S.R. at 292.  The Court then interpreted "'along high-water mark of the Harbor of Pago Pago'" to mean that the road was to be within a reasonable distance of the high-water mark, *id.* at 293, and that the condemnation included the land between the highway and the sea, *id.* at 296.  This is confirmed by Regulation No. 16, which forbids anyone from erecting a building on this area without the permission of the government; thus, the government was exercising its proprietary rights.  This interpretation of the ordinances, affirmed by the Appellate Division in that case, is the only reasonable interpretation.  As the *Lago* court noted, building a road at an equal distance from the shoreline would be extremely impractical, especially given the many windings and curves of the Pago Pago harbor area.  *Id.* at 293-94.

---

[7]  This issue is addressed in the next section.

This condemnation in this case was not unreasonable--it was not an overbroad taking. The land was "condemned and appropriated for public uses," which logically include more than simply a road. Additionally, as the trial court noted,

> [w]ith the increasing demands of modern day automobile traffic within the territory, there is logically no alternative available to the government for road improvements in the Pago Pago bay area but the possibility of going sami side.

Thus, through the ordinance, the United States government acquired the land between the road and the shoreline, which includes the accompanying littoral rights; ASG now possesses these rights.[8] These rights were necessary for the "public uses" of the ordinance to permit such improvements as seawalls to protect the road.

Additionally, in 1974 filled-in lands and submerged lands were transferred to ASG, subject to several exceptions, to be administered in trust for the benefit of the people of American Samoa. 48 U.S.C. § 1705(a).[9] This transfer includes the filled-in portion of

---

[8] Anderson's claim that he acquired the littoral rights when ASG quitclaimed the Pago Plaza parcel to him, *see* footnote 2 and accompanying text, *supra*, is incorrect. ASG quitclaimed the land up to the old shoreline, but ASG had already acquired the filled-in portion when the land was filled, and the littoral rights had moved with the shoreline. ASG thus retained the filled portion from the old shoreline up to and including the new shoreline and its accompanying littoral rights.

[9] 48 U.S.C. § 1705(a) states:

> Subject to valid existing rights, all right, title, and interest of the United States in lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide . . . and in artifically [sic] made, filled in, or reclaimed lands which were formerly permanently or periodically covered by tidal waters, are hereby conveyed to the [government of American Samoa] . . . to be administered in trust for the benefit of the people thereof.

Logopesega, which formerly belonged to the United States Government. The exception of 48 U.S.C. § 1705(b)(ix) claimed by Anderson, that he had lawfully acquired the formerly submerged lands by purchase of Court Grant 852, does not apply. These formerly submerged lands were the property of the United States, as part of a navigable water within a territory of the United States. *Lago*, 4 A.S.R. at 301 (citing 65 C.J.S. *Navigable Waters* 197). Anderson could only have acquired land up to the mean high tide mark through purchase of Court Grant 852.

Anderson's reliance on *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313 (1973), in an attempt to assert his right to the filled-in portion of Logopesega, is misplaced. In *Bonelli*, a federal re-channelling project resulted in thousands of acres of dried-up riverbed land; the state and the cattle company, the riparian owner, then disputed the ownership of this land. The United States Supreme Court held that the cattle company held title, as the riparian owner.

Because ASG owns the littoral rights of Logopesega, however, if 48 U.S.C. § 1705 were not applicable and *Bonelli* were, the latter would support ASG rather than Anderson. The initial condemnation was for a permissible public purpose. Additionally, the filling project was undertaken for another, equally valid public purpose--the creation of a park and recreation area for the public.

Through Ordinance No. 15, title to the littoral rights along the shore of Pago Pago Harbor from Blunt's Point to Breaker's Point, including the (previous) shoreline of Court Grant 852, vested in and still remains in the government. ASG therefore owns the reclaimed land attached to Court Grant 852, either as the littoral owner or through 48 U.S.C. § 1705.

3. Laches

One example of existing rights is found in 48 U.S.C. § 1705(b)(ix):

all submerged lands lawfully acquired by persons other than the United States through purchase, gift exchange, or otherwise.

The trial court also properly found that ASG's defense of laches was valid. Contrary to Anderson's assertion, the littoral rights were not taken in 1966 when the filling operations began, but in 1900, when the ordinances were enacted. *Mageo v. Government*, 4 A.S.R. 874, 885 (App. Div. 1963). Appellant, in waiting nearly 90 years to claim that he--or rather, his predecessor in interest--was not compensated for an alleged taking, has shown "the classic elements of laches--an unreasonable delay in the assertion of their rights by one party and undue prejudice to the other party." *Siofele v. Shimasaki*, 9 A.S.R.2d 3, 14 (1988).

Appellant states that "[t]he doctrine of stale demand applies only where, because of the lapse of time, it would be inequitable or injustice would result to allow a party to enforce his legal rights." *Appellant's Brief* at 19. Yet Anderson *has* no legal rights in this situation. The 1900 condemnation, for a valid public purpose, was permissible. An action for the recovery of land is barred if it is not brought within 20 years after it accrues. A.S.C.A. § 43.0120(6). Thus, any right to recover such land by claiming the ordinances were invalid should have been brought no later than 1920. The statute of limitations for adverse possession does not, however, run against the government, *Mageo v. Government*, 4 A.S.R. 874, 881-82 (App. Div. 1963); *Teo v. Totoa*, 2 A.S.R. 243 (1947), so the government has owned the land since 1900, whether or not the Fosters continued to occupy it.

By waiting so long to assert this claim, Anderson/Foster has prejudiced ASG. Several different bodies have governed American Samoa since the Treaty of Cession, and the governmental records from these different periods have been scattered and sometimes lost, making it difficult, if not impossible, for ASG to affirmatively show compensation was paid.

## Conclusion

For the foregoing reasons, we AFFIRM the trial court's decision awarding the sami portion of Logopesega to the ASG. We likewise AFFIRM the trial court's decision that the communal families acquired the mauga portion of Logopesega through adverse possession.